[No. 39278.    En Banc.    October 10, 1968.]

*In the Matter of* EDDY W. (WILBUR) ELLIOTT, *a Bankrupt.*
*(Certification From Federal Court.)* *

*Reported in 446 P.2d 347.

*Howe, Davis, Riese & Jones* and *Michael R. Green,* for appellant.

*Alfred J. Westberg* and *Hubert Travaille,* for respondents.

*Charles Horowitz* and *Charles E. Corker,* amici curiae.

ROSELLINI, J.—The 39th legislature enacted Laws of 1965, ch. 99, p. 1302 (RCW 2.60), called the Federal Court Local Law Certificate Procedure Act, which provides a procedure whereby the federal district courts may certify questions of law to this court. Proceeding under the authority of this law, the District Court of the United States for Western District of Washington, by order of Judge William J. Lindberg, presiding in a bankruptcy case, has certified to this

court a question pertaining to the interpretation of section 48.18.410 of the Revised Code of Washington, which concerns the disposition of life insurance proceeds in insolvency proceedings.

At the outset the question is raised whether the legislative act providing for the certification procedure is constitutional. Before attacking this question, we think it would be well to summarize the background of the law.

Prior to *Erie R. R. v. Tompkins,* 304 U.S. 64, 82 L. Ed. 1188, 58 Sup. Ct. 817, 114 A.L.R. 1487 (1938), federal courts were not required to apply state law in the disposition of diversity cases or controversies pending before them, but were free to exercise an independent judgment as to what the common law of the state was or should be.

Since *Erie,* federal courts have been required to follow local law as expounded by state courts. This has not been a problem where there is a state decision or rule on the question. However, where the state law is not clear, either because of the absence of state decisions or conflicting decisions in the same state, federal courts have been in a quandary.[1]

A federal court, confronted with the necessity of ascertaining and applying local law, has been compelled to either (1) guess at the law and risk laying down a rule which may later prove to be out of harmony with state decisions, since state courts are not bound by federal court interpretations of state statutes, or (2) abstain from decid-

---

[1] *E.g., cf., Green v. American Tobacco Co.,* 304 F.2d 70 (5th Cir. 1962), *Green v. American Tobacco Co.,* 325 F.2d 673 (5th Cir. 1963).

The court in expressing its thanks to the Supreme Court of Florida, in answer to a question which the Court of Appeals had certified to the Supreme Court of Florida, said, at 325 F.2d 674:

That answer has saved this Court, through the writer as its organ, from committing a serious error as to the law of Florida which might have resulted in a grave miscarriage of justice. The Supreme Court of Florida has been a very real help in the administration of justice.

The error of the federal court with respect to the law of Wisconsin was noted in *In re Stoddard's Estate,* 60 Wn.2d 263, 268, 373 P.2d 116 (1963).

ing the case until the state courts pass upon the point of law involved.

The great burden created by the abstention doctrine is the matter of delay. If the doctrine is invoked, the parties may appeal to the United States District Courts of Appeal and possibly to the United States Supreme Court. If the case is stayed or dismissed, the litigant must bring the case in the state courts. The parties *must* obtain a decision from the highest state court.

The delay and expense give advantage to a financially-endowed litigant, and he may be able to control the forum. He can intentionally choose federal adjudication in a case reasonably certain to be sent back to the state court. In this way the adversary who is less able financially may be forced to settle or abandon his suit.

Thus the legislature, in enacting Laws of 1965, ch. 99, sought to afford a procedure whereby litigants in federal court actions might obtain answers, in an expeditious manner, to questions of state law which controlled the disposition of their cases. The procedure is a shortcut, eliminating the necessity of instituting a declaratory judgment action in the superior court and taking an appeal to this court. The statute is not designed to increase the workload of this court, but rather to simplify the procedure for obtaining decisions on state questions which are relevant in federal court suits.

It is suggested that the enactment of RCW 2.60 was not within the power of the state legislature because it requires of the court a function which it cannot constitutionally perform. Const. art. 4, § 1, provides: "The judicial power of the state shall be vested in a supreme court, superior courts, justices of the peace, and such inferior courts as the legislature may provide." Const. art. 4, § 4, provides:

> The supreme court shall have original jurisdiction in habeas corpus, and quo warranto and mandamus as to all state officers, and appellate jurisdiction in all actions and proceedings, excepting that its appellate jurisdiction shall not extend to civil actions at law for the recovery of money or personal property when the original amount in

controversy, or the value of the property does not exceed the sum of two hundred dollars ($200) unless the action involves the legality of a tax, impost, assessment, toll, municipal fine, or the validity of a statute. The supreme court shall also have power to issue writs of mandamus, review, prohibition, habeas corpus, certiorari and all other writs necessary and proper to the complete exercise of its appellate and revisory jurisdiction. Each of the judges shall have power to issue writs of habeas corpus to any part of the state upon petition by or on behalf of any person held in actual custody, and may make such writs returnable before himself, or before the supreme court, or before any superior court of the state or any judge thereof.

RCW 2.60.020, the operative section under which the question has been certified, states:

When in the opinion of any federal court before whom a proceeding is pending, it is necessary to ascertain the local law of this state in order to dispose of such proceeding and the local law has not been clearly determined, such federal court may certify to the supreme court for answer the question of local law involved and the supreme court shall render its opinion in answer thereto.

■ It must be remembered that the state constitution is a limitation upon the actions and powers of the legislature, instead of a grant of power. So far as the power of the legislature is not limited by the constitution, it is unrestrained. *Standard Oil Co. v. Graves,* 94 Wash. 291, 307, 162 Pac. 558 (1917); *Clark v. Dwyer,* 56 Wn.2d 425, 443, 353 P.2d 941 (1960).

This court has recognized that the legislature can confer jurisdiction on the courts or provide for statutory procedures for the exercise of jurisdiction by the court, provided the court exercises only judicial power. Such a limitation would be read into the statute in the absence of an express provision to the contrary. Thus the Uniform Declaratory Judgments Act (RCW 7.24) does not expressly forbid the rendering of advisory opinions. The court has simply construed the statute as inapplicable where such an opinion is sought. *State ex rel. O'Connell v. Dubuque,* 68 Wn.2d 553, 413 P.2d 972 (1966). And it has upheld the Declaratory

Judgments Act as constitutional. *Acme Finance Co. v. Huse,* 192 Wash. 96, 73 P.2d 341, 114 A.L.R. 1345 (1937).

This court in *State ex rel. Kurtz v. Pratt,* 45 Wn.2d 151, 273 P.2d 516 (1954), recognized again the power of the legislature to increase its jurisdiction. In an original proceeding in the Supreme Court, the county auditor was restrained from placing the names of three candidates for justice of the peace on the ballot. This was done by authority of RCW 29.04.030, which gives any judge of the Supreme Court the power to act where error or omission of any clerk or auditor appears in an election. Const. art. 4, § 4, reads as follows: "The supreme court shall have original jurisdiction in habeas corpus, and quo warranto and mandamus as to all state officers . . . ." Thus RCW 29.04.030 expands the original jurisdiction of the court.

We said, at 157:

> If we should refuse to act in the instant matter, we would be remiss in our duty as members of the court of last resort of this state, in that we would disregard the responsibility relative to the protection and orderly conduct of elections tendered to us by the legislature in its enactment of Rem. Rev. Stat., § 5202. [*cf.* RCW 29.04.030]

The reasoning of *Sun Ins. Office, Ltd. v. Clay,* 133 So.2d 735 (Fla. 1961), supports the constitutionality of RCW 2.60. The provisions of the Florida Constitution are substantially similar to article 4, section 5 of the Washington Constitution.[2]

---

[2]*The provision, constitutional or statutory, relative to the jurisdiction of the Supreme Court.*

Article V, § 4 of the Florida Constitution, after making provision for the organization of the Supreme Court, deals with the subject of jurisdiction, subsection (2) as follows:

(2) *Jurisdiction.* . . .

. . . .

The supreme court may issue writs of mandamus and quo warranto when a state officer, board, commission, or other agency authorized to represent the public generally, or a member of any such board, commission, or other agency, is named as respondent, and writs of prohibition to commissions established by law, to the district courts of appeal, and to the trial courts when questions are involved upon which a direct appeal to the supreme court is allowed as a matter of right.

The supreme court may issue all writs necessary or proper to the complete exercise of its jurisdiction.

The Supreme Court of Florida in *Sun Ins. Office, Ltd. v. Clay, supra,* dealt with the basic constitutional issue raised by the Florida Certificate Procedure Act (Fla. Stat. Ann. § 25.031) saying, at 741:

> The real question here is whether § 4 of Revised Article V of our Constitution, adopted in 1956, which delineates the appellate jurisdiction of this court and provides for the issuance by it of named writs, should be construed as prohibiting this court from exercising any judicial powers other than those expressly provided for therein.

The court considered the nature of Article V, § 4 and held that this provision of the Florida Constitution was only a restriction upon state power, rather than a grant (just as is our similar provision), and that, accordingly, the legislature could enlarge the jurisdiction of the state Supreme Court where such enlargement was not forbidden by the constitution. The court said, at 742-43:

> We have concluded that, in the absence of a constitutional provision expressly or by necessary implication limiting the jurisdiction of the Supreme Court to those matters expressly conferred upon it, *and in the absence of a constitutional provision expressly conferring upon another court jurisdiction to exercise the judicial power* which is the subject matter of § 25.031 and Rule 4.61, and in the light of the well settled rule that all sovereign power, including the judicial power, "not limited by a state constitution inheres to the people of [the] state," such power may be granted to this court by statute if it is deemed to be a substantive matter, or by a rule of this court if it is deemed to be a matter of "practice and procedure," cf. State v. Furen, supra, 118 So.2d 6, 11. It follows that this court, having in the background derived authority both by statute prior to 1956 and by rule of court subsequent to the 1956 organic revision above referred to, may entertain the subject certificate.[3] (Italics ours.)

It should also be pointed out that Article V, § 6, dealing with the jurisdiction of the circuit courts in Florida is

---

[3] The court could have cited outside supporting authority as well for the principle thus applied, *e.g., Epstein v. Bendersky,* 130 N.J. Eq. 180, 21 A.2d 815 at 816 (1941). *See also* 21 C.J.S. *Courts* § 122 at 184, note 10 (1940).

substantially the same as Const. art. 4, § 6 of our state constitution dealing with the jurisdiction of the superior courts, and that therefore the holding in *Sun Ins. Office, Ltd. v. Clay, supra,* is especially applicable to the situation existing in Washington.

Assuming, however, that the legislature does indeed lack power to increase the duties of this court in spite of our former holdings to the contrary, it does not follow necessarily that the act has this effect. If it is construed as permissive, it imposes no obligation on the court but merely gives it an option.

■■ We are asked to construe RCW 2.60.020 as mandatory because it uses the word "shall." In this field of legal inquiry the word "shall" does not necessarily mean "must," but may mean "may."

The legislative intent to confer a judicial power is construed to mean "may" notwithstanding the use of the word "shall." This principle has been adopted in a long line of cases. It was applied in *Clancy v. McElroy,* 30 Wash. 567, 70 Pac. 1095 (1902), and has been repeatedly applied elsewhere. *State v. Doe,* 149 Conn. 216, 178 A.2d 271, 277 (1962); *In re Laub,* 145 Pa. Super. 513, 21 A.2d 575 (1941); *State ex rel. Carpenter v. St. Louis,* 318 Mo. 870, 2 S.W.2d 713 (1928); 82 C.J.S. *Statutes* § 380 (1953); 59 C.J. *Statutes* § 635 at 1086, n. 13 (1932); 57 C.J. *Shall* § 7 at 556, n. 41 (1932).

In 82 C.J.S. *Statutes, supra,* it is stated at 881-82:

Where a statute makes that legal and possible which otherwise there would be no authority to do, it will be construed as permissive only, although using the word "shall." It is also a general rule that the word "shall," when used by the legislature in a grant of authority to a court, means "may," and that the use of the word "shall" in a statute directing a court to determine certain matters does not necessarily confine such power to that tribunal. . . . The word "shall" must also be construed as permissive when the statute can thereby be upheld, if a construction to the contrary could render it unconstitutional.

The phrase "shall render" is construed subject to the implied limitations of the constitution. As stated in *Robb v. Tacoma,* 175 Wash. 580, 28 P.2d 327, 91 A.L.R. 1010 (1933) (quoted with approval in *Union High School Dist. No. 1, Skagit Cy. v. Taxpayers of Union High School Dist. No. 1, Skagit Cy.,* 26 Wn.2d 1, 5-6, 172 P.2d 591 (1946)), we said, at 586:

> If the act is fairly and reasonably open to more than one construction, that construction will be adopted which will harmonize the statute with the constitution and avoid a conflict therewith.

In 16 Am. Jur. 2d *Constitutional Law* § 144 at 345 (1964), it is stated:

> In construing statutes with relation to constitutional provisions, the courts take into consideration the principle that every statute is to be read in the light of the Constitution, and that the Constitution and a statute involving constitutional rights will be construed together as one law. . . .
>
> . . . .
> The rule has developed that the courts, in applying rules of statutory construction to legislation which is under constitutional attack, must do so with a view to bringing the legislation into line with constitutional requirements.

These Washington cases support these statements: *Robb v. Tacoma, supra; In re Milecke,* 52 Wash. 312, 100 Pac. 743 (1909); *State v. Lewis,* 45 Wash. 475, 88 Pac. 940 (1907).

There is case law to the effect that even if the statute is intended to be imperative it will be construed as discretionary because the statute is subject to the implied limitations of the constitution as a matter of construction. *State v. Doe, supra; In re Laub, supra; Simmons v. State,* 160 Fla. 626, 36 So.2d 207 (1948); *Fort Howard Paper Co. v. Fox River Heights Sanitary Dist.,* 250 Wis. 145, 26 N.W.2d 661 (1947). Such holdings are consistent with the philosophy of judicial self-restraint. (*See* 16 Am. Jur. 2d *Constitutional Law* § 109 (1964).)

In *Becker v. Lebanon & M. St. Ry.*, 188 Pa. 484, 41 Atl. 612 (1898), a statute providing that where corporations are acting outside their franchises, the court "shall" by injunction, at the suit of private parties or other corporations, restrain such injurious acts, the court held that the word "shall" was not mandatory and that before an injunction would issue, a proper case therefor would have to be made out. The court said, at 496:

> The word "shall" when used by the legislature to a court is usually a grant of authority and means "may," and even if it be intended to be mandatory it must be subject to the necessary limitation that a proper case has been made out for the exercise of the power.

Aside from the meaning to be ascribed to the word "shall" as a matter of intention, independent of the issue of constitutionality, the question of constitutionality does itself aid in determining the meaning to be ascribed to the word "shall." We have heretofore called attention to the rule, as stated in 16 Am. Jur. 2d *Constitutional Law* § 144 at 345 (1964), ". . . that every statute is to be read in the light of the Constitution, and that the Constitution and a statute involving constitutional rights will be construed together as one law. . . ." The rule has developed that the courts, in applying rules of statutory construction of legislation which is under constitutional attack, must do so with a view to bringing the legislation into line with constitutional requirements.

The rule here emphasized is that stated in 82 C.J.S. *Statutes* § 380 at 882:

> The word "shall" must also be construed as permissive when the statute can thereby be upheld, if a construction to the contrary could render it unconstitutional.

The foregoing principle is supported by the reasoning of cases such as *Union High School Dist. No. 1, Skagit Cy. v. Taxpayers of Union High School Dist. No. 1, Skagit Cy.*, *supra*.

RCW 2.60.020 is premised upon the ability of the Supreme Court of Washington to determine by its decision

what the local law of this state is. The certified question seeks an answer in the decisional law of this state. The decisional law may be the interpretation of a statute or the formulation of a common law rule. Whatever the subject matter, it is a subject matter capable of being dealt with by a court rendering a decision, *i.e.*, exercising judicial power. Implicit, therefore, in the statute, and indeed its fundamental premise, is the premise that the certified question must call for a decision which the Supreme Court is empowered to give. It is to be noted too that in RCW 2.60.020 the federal court certifies the question and the Supreme Court "shall render its opinion in answer thereto." "Opinion" as that term is defined in RCW 2.60.010(6) means "the written opinion of the supreme court of Washington. . . ." If, in the unlikely event that a federal court, notwithstanding the basic premise of the act that the certified question must call for an answer which the Supreme Court of Washington is legally able to give in the exercise of judicial power, the federal court should certify a question that calls for an answer which the Supreme Court cannot give, as, for example, a question that calls for an answer to a political question, the opinion of the Supreme Court "in answer thereto" would be that under Washington law there is not and cannot be decisional law on the question certified for answer.

■ We hold that the statute is permissive, rather than mandatory, and does not impose onerous and unconstitutional dictates upon the court.

■ Lastly, it is contended that the statute is invalid because it requires this court to render advisory opinions. This is not the effect of the statute. In the instant case we have an actual controversy existing between the parties to the action. We have a certified agreed statement of facts, together with all of the necessary evidence and documents from which to render an opinion. The judgment which will be rendered will be enforced by the federal district court. It will be res judicata between the parties.

Our decision will be a legal precedent applicable in all future controversies involving the same legal question until and unless this court overrules its opinion. The legal question which must be determined is not an abstract question of law, but a question of law which will determine whether $11,584.45 belongs to the insured or his creditors.

*In re Richards,* 223 A.2d 827 (Me. 1966) at 830, points out that the decision of the court in answer to a certified question is binding upon the parties, the Supreme Judicial Court of Maine concluded: "In retrospect we see here no more than a proper exercise of 'judicial power.' "

The case at bar illustrates clearly the needed and binding character of the decision of this court to the question certified. The whole reason for invoking the certified question procedure is to obtain an authoritative decision of this court as to the meaning of RCW 48.18.410 so that the district court can apply that meaning in disposing of the bankruptcy proceeding pending before it. The reason for the certification is that different referees of the bankruptcy courts have given conflicting interpretations of the statute. That the district court will apply the ruling of this court is evident not only from the record, but from the compulsion of *Erie R. R. v. Tompkins,* 304 U.S. 64, 82 L. Ed. 1188, 58 Sup. Ct. 817, 114 A.L.R. 1487 (1938). As the Supreme Judicial Court of Maine said in *In re Richards, supra,* at 832:

This court will treat the judgment which it renders on legal issues tendered in certification proceedings as having the force of decided case law within the courts of this state and as constituting res adjudicata as between the same parties in any subsequent action brought in our courts. We rely upon the doctrine of Erie R. R. Co. v. Tompkins (1938), 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, to make our decision and opinion given in answer to questions under this procedure conclusive and determinative in the federal courts with respect to the state of the law in Maine.

Assuming, however, that an opinion rendered in answer to a certified question is nothing more than an advisory opinion, this does not mean the court lacks power

to render such an opinion. The exercise of the *judicial* power requires that an actual controversy be before the court for determination. It does not follow that the court lacks all extrajudicial power. Certainly the rule-making power, which is held to be inherent, and the power to administer itself are not judicial powers, and yet they are powers of the court. The court also has the power to render advisory opinions. The best and simplest way to demonstrate the validity of this proposition is to cite instances in which this court has exercised the power.

A recent case is *National Elec. Contractors Ass'n, Puget Sound Chapter v. Seattle School Dist. No. 1*, 66 Wn.2d 14, 20, 400 P.2d 778 (1965). The majority of the court, speaking through Hill, J., said:

> We are persuaded that we are justified in exercising our discretion and retaining this appeal, notwithstanding that the immediate issue of whether an injunction should have been entered in this case is now moot. It seems desirable that school districts throughout the state should have an authoritative construction of RCW 28.58.135 . . . for their guidance in like situations.

In that case, this court rendered an advisory opinion for the benefit of school districts generally, although none of them had an existing justiciable controversy before the court.

In the case of *State ex rel. O'Connell v. Dubuque*, 68 Wn.2d 553, 413 P.2d 972 (1966), this court found that a justiciable controversy existed, although the rights of the parties before the court were not at issue. This court was asked to determine whether legislators who had voted to increase the salaries of legislators would be eligible for re-election and entitled to the increased salary if re-elected. The parties before the court were the Attorney General, who was the petitioner, and the parties he named as defendants, who were the county auditors of 14 counties and their respective prosecuting attorneys, the Secretary of State, and a named elector and taxpayer. Another taxpayer intervened. This court did not say what the special justiciable rights of these parties were, but on the question of

whether a justiciable controversy existed, so as to give the court jurisdiction under the Declaratory Judgments Act (RCW 7.24) we said, at 557-58:

> Although neither the constitution, nor RCW 7.24, *et seq.*, nor the court's inherent duty require the Supreme Court to render advisory opinions to the legislature, even on a direct request therefor, all courts should carefully consider legislative declarations of facts upon which a claimed controversy exists. The courts, without being bound thereby, should and do accord great respect to the official declarations of that constitutional body, possessed as it is of the sovereign legislative power, that circumstances exist so genuinely affecting the rights of citizens and members of the legislature as to require in the public interest a decision of the Supreme Court of the state. Although we are not bound by the recitals set forth in the legislative request, we will not ignore the legislature's assertions of fact upon which the controversy is said to depend.

What are the principal elements of a justiciable controversy as contemplated by the Uniform Declaratory Judgments Act, RCW 7.24? First, a justiciable controversy requires parties having existing and genuine, as distinguished from theoretical, rights or interests. Second, the controversy must be one upon which the judgment of the court may effectively operate, as distinguished from a debate or argument evoking a purely political, administrative, philosophical or academic conclusion. Third, it must be a controversy the judicial determination of which will have the force and effect of a final judgment in law or decree in equity upon the rights, status or other legal relationships of one or more of the real parties in interest, or, wanting these qualities be of such great and overriding public moment as to constitute the legal equivalent of all of them. Finally, the proceedings must be genuinely adversary in character and not a mere disputation, but advanced with sufficient militancy to engender a thorough research and analysis of the major issues. Any controversy lacking these elements becomes an exercise in academics and is not properly before the courts for solution. The decisions of this court, when considered seriatim, recognize and apply this definition. *Hubbard v. Medical Serv. Corp.,* 59 Wn.2d 449, 367 P.2d 1003 (1962); *State ex rel. Ruoff v. Rosellini,* 55 Wn.2d

614

554, 348 P.2d 971 (1960); *Huntamer v. Coe*, 40 Wn.2d 767, 246 P.2d 489 (1952); *Adams v. Walla Walla*, 196 Wash. 268, 82 P.2d 584 (1938); *Washington Beauty College, Inc. v. Huse*, 195 Wash. 160, 80 P.2d 403 (1938); *Acme Finance Co. v. Huse*, 192 Wash. 96, 73 P.2d 341, 114 A.L.R. 1345 (1937).

We concluded in regard to the question before the court in that case:

Sound considerations of public policy invite a solution of the controversy now, well in advance of the filing of declarations of candidacy and the printing of ballots for the 1966 primary elections. *Heavens v. King Cy. Rural Library Dist.*, 66 Wn.2d 558, 404 P.2d 453 (1965). Any other ruling compels the haste, confusion and uncertainty arising from the chronology of events in *State ex rel. Pennick v. Hall*, 26 Wn.2d 172, 173 P.2d 153 (1946). The trial court correctly ruled this a justiciable controversy cognizable under the Uniform Declaratory Judgments Act, RCW 7.24. (Footnote omitted.)

In all of the cases cited in the second paragraph of the above quotation, save one, this court said that there must be an actual controversy existing between the parties to the action before the court is authorized to render a decision under the Declaratory Judgments Act. The exception is *Huntamer v. Coe*, 40 Wn.2d 767, 246 P.2d 489 (1952), wherein this court engrafted an exception upon the requirement of a justiciable controversy, that is, the "great public interest" exception. The plaintiffs in that case were not candidates for public office but contended they would be prevented from becoming candidates because they would refuse to take the loyalty oath prescribed by the legislature. In deciding that the question of the constitutionality of the statute was properly before the court, nine judges of this court concurred in an opinion which based the holding upon authorities cited and quoted as follows:

In Anderson, Actions for Declaratory Judgments 1413 (1951), the following statement is found:

"A petition for a declaratory judgment is particularly appropriate to determine the constitutionality of a statute when the parties desire, and the public need requires, a

speedy determination of the public interest involved therein."

In *Allison v. Sharp,* 209 N. C. 477, 481, 184 S. E. 27, where the facts admittedly were somewhat different from those in the case at bar, the supreme court of North Carolina said:

"The plaintiffs and all the people of the State are vitally affected by the statute in controversy. While there was another remedy at law available to them, they have challenged the constitutionality of the statute under which they contend that the registrar refused them registration. Under such circumstances and conditions, the Uniform Declaratory Judgment Act affords a ready means of testing its validity." (*Huntamer v. Coe,* 40 Wn.2d 767, 771, 246 P.2d 489 (1952).)

Thus was the "great public interest" exception to the "justiciable controversy" requirement born. In the *Dubuque* case, *supra,* it was formally embodied in the definition of "justiciable." That is, as this court framed the rule there, the requirements of (1) interested parties, (2) a controversy on which the judgment of the court can operate, and (3) a controversy the judicial determination of which will have the effect of a final judgment upon the rights, status or other legal relationships of the parties, do not apply if the question submitted to the court is of sufficient public interest and the need for an immediate answer is of sufficient urgency to induce the court to exercise its discretion and render a declaratory judgment. Such a judgment is really nothing more than an advisory opinion, and this court let it be known that it was aware of that fact in the *Dubuque* case. The opinion in that case was frankly rendered in response to a direct request from the legislature for the advice of the court. The interested parties were those legislators who planned to run for re-election.[4] They were not parties to the action, nor were they represented in

---

[4]*See State ex rel. Ruoff v. Rosellini,* 55 Wn.2d 554, 348 P.2d 971 (1960), holding that no justiciable issue relating to the eligibility of candidates is presented prior to the filing of the declaration of candidacy.

the action. The interest of the actual parties was hardly greater than that of the public generally.

Thus, this court can and does render advisory opinions when it is convinced that the public interest makes it desirable to do so. It does not do so often; but when a proper case presents itself, this court exercises its discretion and gives its opinion, even though its judgment will not operate on any controversy between parties before it. The power to render such opinions should of course be exercised with great reluctance and only when there are urgent and convincing reasons for doing so; but this court has the power to render this courtesy, which is so beneficent in most cases where it is extended.

While such an opinion is not binding on the court in the future and does not determine the rights of any parties before the court, the experience has been that advisory opinions are respected by the public and are persuasive in future cases. In other words, they are not useless.

An objection to the rendering of advisory opinions is that questions are not so vigorously debated when the parties do not have a personal or financial interest in the outcome.

In this case this court has not only the briefs of the parties, who have a genuine interest in the outcome of the litigation, but it has also been furnished splendid briefs by Charles Horowitz of Seattle and Professor Charles E. Corker of the University of Washington School of Law, who have vigorously argued their respective positions.

While we have concluded that the statute does not in fact call for the rendering of an advisory opinion, if this was the nature of the opinion to be given, we would nevertheless find this a proper case in which to render such an opinion. We believe that citizens of the state are entitled to have the same rule of law applied on an issue regardless of whether it arises in a federal or state court. The Local Law Certification Procedure Act synthesizes a dual court system and removes one of the problems of the system, that of maintaining uniformity in the law.

So patent is the power of a court to render an opinion in response to a certified question that New Hampshire has adopted the practice by court rule, not waiting for an expression of legislative approval of the idea. Supreme Court Rule 21, which can be found in Vol. 4-A Replacement, N. H., RSA 1968 at pp. 408 and 409, is treated by the New Hampshire court as a rule of procedure, that court obviously finding no constitutional impediment to the adoption of such a rule.

This court, under its rule-making power (Laws of 1925, Ex. Ses., ch. 118 and RCW 2.60.030(7)) could do as the Supreme Court of New Hampshire has done. It could also accept a certified question and respond to it even if there were no implementing statute or rule. It is within the inherent power of the court as the judicial body authorized by the constitution to render decisions respecting the law of this state.

■ We conclude that Laws of 1965, ch. 99, p. 1302, is not invalid in that it imposes on the court duties or gives it powers not provided in Const. art. 4, §§ 1 and 4.

A fear has been expressed that the federal courts will flood the Washington court with certification questions. This is a fear without foundation in fact. The certification act can only be used when there is no state decision or decisions in the state are in conflict. The possibility of an avalanche of such cases is remote. Furthermore, the act is construed as permissive and not mandatory, thus a certified question which does not meet the criteria of the certification act can be summarily rejected. Nor would this court take jurisdiction of a certified question which involves ultimately a federal constitutional issue, for again this would not meet the criteria of the certification statute. Experience also indicates that the procedure will be sparingly used.

The certification act was enacted in 1965. Since that time only two cases have been certified. The instant case was the first and the second case was improperly certified, as it was not a case of first impression and involved a federal constitutional issue. Had we promulgated rules for certification

as the act provides, undoubtedly the federal court would have refrained from certifying the second question.[5]

The federal court has certified the following question:

Whether cash surrender value of life insurance as defined in Section 48.18.410 of the Revised Code of Washington is exempt property as against a Trustee in bankruptcy where the insurance policy is community property of the bankrupt and his wife, designates his wife as beneficiary thereon, and the terms of said policy reserved to the insured the absolute right to change beneficiaries without obtaining the consent of the then designated beneficiary.

RCW 48.18.410 provides as follows:

(1) The lawful beneficiary, assignee, or payee of a life insurance policy, other than an annuity, heretofore or hereafter effected by any person on his own life, or on the life of another, in favor of a person other than himself, shall be entitled to the proceeds and avails of the policy against the creditors and representatives of the insured and of the person effecting the insurance, and such proceeds and avails shall also be exempt from all liability for any debt of such beneficiary, existing at the time the proceeds or avails are made available for his own use.

(2) The provisions of subsection (1) of this section shall apply

(a) whether or not the right to change the beneficiary is reserved or permitted in the policy; or

---

[5]In the state of Maine, since the enactment of the certification law in 1965, two cases have been certified as of February 26, 1968: *Norton v. Benjamin,* 220 A.2d 248 (Me. 1966) and *In re Richards,* 223 A.2d 827 (Me. 1966).

The certification act has not substantially increased the workload of the Florida court. The federal courts have been circumspect in certifying questions. They have received certificates in the following: *Sun Ins. Office, Ltd. v. Clay,* 133 So.2d 735 (Fla. 1961); *Green v. American Tobacco Co.,* 154 So.2d 169 (Fla. 1963); and *Dresner v. Tallahassee,* 164 So.2d 208 (Fla. 1964). The foregoing are illustrative, although there have been three or four others. It has been found that the questions certified are always quite important and the certificates have consistently appeared to be justifiable. It has been the feeling that this procedure has generated a degree of cordiality in handling inter-jurisdictional problems.

(b) whether or not the policy is made payable to the person whose life is insured or to his estate if the beneficiary, assignee or payee shall predecease such person; except, that this subsection shall not be construed so as to defeat any policy provision which provides for disposition of proceeds in the event the beneficiary shall predecease the insured.

(3) The exemptions provided by subsection (1) of this section, subject to the statute of limitations, shall not apply

(a) to any claim to or interest in such proceeds or avails by or on behalf of the insured, or the person so effecting the insurance, or their administrators or executors, in whatever capacity such claim is made or such interest is asserted; or

(b) to any claim to or interest in such proceeds or avails by or on behalf of any person to whom rights thereto have been transferred with intent to defraud creditors; but an insurer shall be liable to all such creditors only as to amounts aggregating not to exceed the amount of such proceeds or avails remaining in the insurer's possession at the time the insurer receives at its home office written notice by or on behalf of such creditors, of claims to recover for such transfer, with specification of the amounts claimed; or

(c) to so much of such proceeds or avails as equals the amount of any premiums or portion thereof paid for the insurance with intent to defraud creditors, with interest thereon, and if prior to the payment of such proceeds or avails the insurer has received at its home office written notice by or on behalf of the creditor, of a claim to recover for premiums paid with intent to defraud creditors, with specification of the amount claimed.

(4) For the purposes of subsection (1) of this section a policy shall also be deemed to be payable to a person other than the insured if and to the extent that a facility-of-payment clause or similar clause in the policy permits the insurer to discharge its obligation after the death of the individual insured by paying the death benefits to a person as permitted by such clause.

(5) No person shall be compelled to exercise any rights, powers, options or privileges under any such policy.

The trustee argues that this statute grants an exemption to the beneficiary alone, whose rights cannot vest until the death of the insured; that the rights to the cash surrender value of a life insurance policy are contractual rights of the insured alone, in which rights the beneficiary can have no interest during the lifetime of the insured; that, since the exemption does not run to the insured, all contractual rights of action of the insured, such as the right of a trustee to the cash surrender value of the policies, vests in the trustee.

■ All exemption statutes are to be liberally construed to effect their intent and purpose. *Northern Sav. & Loan Ass'n v. Kneisley,* 193 Wash. 372, 378, 76 P.2d 297 (1938), with cited cases.

■ The term "proceeds and avails" as used by many life insurance exemption statutes, includes the cash surrender value of the policies. *Turner v. Bovee,* 92 F.2d 791 (9th Cir., 1937); *Fox v. Swartz,* 235 Minn. 337, 51 N.W.2d 80, 30 A.L.R.2d 739 (1952); *Pearl v. Goldberg,* 300 F.2d 610 (2d Cir., 1962); 1 Collier on Bankruptcy, § 2.16, n. 3 (14th ed.).

■ The Washington statute is remedial in nature and enacted for the public good, and to hold that the cash surrender option or any other interest of the insured under the policy is a property right which is not exempt but is available to the insured's creditors, is to wipe out the protective benefits of the policy and defeat the carefully considered and deliberately enacted statutory purpose of the exemption provisions of the act. As said in *Murphy v. Casey,* 150 Minn. 107, 184 N.W. 783 (1921), at 109-10:

> While it is true that the insured may cash in his policy without regard to the wishes of the beneficiary, that reserved right, since the insurance was effected and taken out for the benefit of the latter, to give force and effect to the statute, must, as to creditors seeking to exercise it in the place and stead of the insured, *be deemed and held subordinate to the rights of the beneficiary.* There are no sound reasons either in morals or in equity and good conscience why the creditor, to the detriment of the beneficiary, should be given the right and privilege of the insured in such cases. No credit is extended to the in-

sured on the faith of the insurance, for all persons dealing with him are bound to know the law, and that money to become due thereon when payable to a third person is exempt from their claims. The statute is wise in its purpose, securing as it does after the death of the insured pecuniary aid and assistance to the beneficiary, usually some one who is dependent upon the insured for support, and should not be frustrated or impaired by opening the door to those who have no just or equitable claim to the money.

. . . .

. . . *To extend to the creditor the option to surrender the policy for the cash value, would wipe out the rights of the beneficiary altogether.* And to award to the creditor the insured's contingent interest, to come into life only in the event he outlived the beneficiary, would throw the whole contract relations of the parties into confusion, and prejudice and finally in all probability wholly destroy the benefit intended by the law to protect in the beneficiary. With the insured's rights turned over to the creditor he naturally would have no further interest in keeping the policy alive by the payment of premiums; while the creditor would willingly let the policy lapse for nonpayment, accepting the lapsed value in discharge of his claim. (Italics ours.)

In *Fox v. Swartz, supra,* at 347, the court said:

It should be borne in mind that these statutes do not purport to give the debtor insured any exemption whatever as to his creditors. The exemption created is given only to the beneficiary and for her sole benefit. See, Bailey v. Wood, 202 Mass. 549, 89 N. E. 147, 25 L.R.A. (N.S.) 722. Strictly speaking, we do not have an exemption in the usual or constitutional sense. Farmers State Bank v. Smith, 36 N. D. 225, 162 N. W. 302. Fundamentally, what has been referred to as an exemption is rather in the nature of a preference which is given to the beneficiary over the creditors of the debtor insured as to insurance proceeds.

The Washington statute specifically protects creditors against fraud. In this case the issue of fraud is absent.

Most life insurance policies provide that after it has been earned the insured, by making a proper claim or exercising a proper option, can procure from the life insurance com-

pany the cash surrender value of the policy. This is a right purely personal to the insured. There is no debt due him from the insurance company until he has created the debt by the exercise of his option. This is well explained in *Fox v. Swartz, supra,* at 348, as follows:

Plaintiff, however, insists that, insofar as the cash-surrender value and dividends with interest are concerned, it is actually an unlimited exemption as to the debtor insured, in that he enjoys the right at all times to withdraw and appropriate to his own use such cash-surrender value, as well as the dividends and interest. What plaintiff wholly overlooks is that, *in the absence of the exercise by the insured of his option to take the cash-surrender value and dividends of a policy that has not matured,* there is no debt due and payable by the insurer to the insured, and *that the right of the insured to create such a debt by the exercise of the option* is not an asset available to creditors, but *is a right purely personal to the insured alone.* Isaac Van Dyke Co. v. Moll, 241 Mich. 255, 217 N. W. 29, 57 A. L. R. 692; Annotations, 44 A. L. R. 1188, 57 A. L. R. 695. An option of this nature has been aptly described as an irrevocable offer made to the insured by the insurer, but in no way binding upon the insurer until acceptance be had. Isaac Van Dyke Co. v. Moll, *supra.* Furthermore, in the absence of fraud, it has been held that a court of equity, at the instance of a creditor, would not be authorized to compel the exercise of an option whereby the rights of the beneficiary would be destroyed. National Bank of Commerce v. Appel Clothing Co. 35 Colo. 149, 83 P. 965, 4 L.R.A. (N.S.) 456, 117 A. S. R. 186. As a general rule, a policy is not to be regarded as liable to seizure under any form of judicial process against the insured so long as the duty of the insurer to pay is subject to any contingency or to any condition precedent. Vance, Insurance (2 ed.) § 161; 84 U. of Pa. L. Rev. 236, 243, 244.

This principle is affirmed in the Washington case of *Pick v. Pick,* 54 Wn.2d 772, 345 P.2d 181 (1959), which cites with approval *Farmers' & Merchants' Bank v. National Life Ins. Co.,* 161 Ga. 793, 131 S.E. 902, 44 A.L.R. 1184 (1926). At 774 of *Pick v. Pick, supra,* this court said:

The rule is stated in 37 A. L. R. (2d) 286, § 5(b) as follows:

"Even though a life insurance policy has a cash surrender value which is available to the insured at his option, it is quite uniformly held by the courts that where the insured has not exercised his option to surrender the policy for its cash surrender value, a creditor of the insured cannot obtain such cash surrender value by means of garnishment proceedings, the general view being *that where the surrender option has not been exercised there is no such present fixed liability or existing indebtedness on the part of the insurer to the insured as is requisite to the maintenance of garnishment.*" (Italics ours.)

The case of *Farmers & Merchants' Bank v. National Life Ins. Co.,* 161 Ga. 793, 131 S. E. 902, 44 A. L. R. 1184, states the reasoning supporting the above rule:

"  .  .  .  we rest our decision in the case upon the ground—and it seems to us perfectly sound—that neither the cash-surrender value nor the cash-loan value of a policy of life insurance like that in question here can be treated as a debt due the insured by the company, until steps have been taken by the insured to effect the loan or to withdraw in cash the accumulated surplus apportioned to the policy by the company. The making of the application for the loan and the surrender of the policy to withdraw in cash the accumulated surplus apportionable to the policy are acts dependent upon the volition of the assured, and a court of equity can not compel him to take those steps, *nor can it render a decree which renders the taking of those steps upon the part of the insured unnecessary. That the insured shall do certain things in order to withdraw the cash-surrender value of the policy, or to secure a loan, is a part of the contract; and* whether he will perform these essential acts is a matter which he can decide and has a right to decide without the interference of a court of equity. There was no debt due from the insurance company to the insured, under the facts recited, that could be reached at law by the process of garnishment; nor can equity, which as a general rule follows the law, bring to bear upon the principal debtor in this case, that is, the insured, any force to compel him to perform acts which he does not desire to perform in order to convert a contingency into an actual debt upon the part of the insurance company."

Nor is RCW 48.18.410, subsection (3) (a), helpful to the trustee. This section states that the exemption "shall not apply (a) to any claim to . . . such proceeds or avails by . . . the insured . . . in whatever capacity such claim . . . is asserted." It thus appears that, if the insured makes any claim to or exercises his option to procure the proceeds and avails of his policy, the exemption provisions become inapplicable. Since this is so carefully spelled out by the legislature, the converse would appear to be true, *i.e.*, that the exemption provisions of the act do apply where no option has been exercised or claim made by the insured.

Subsection (5) of RCW 48.18.410 also carefully provides that the insured cannot be compelled to exercise any right or option he may have under the policy. The apparent legislative intent is to be certain that the policy and all its proceeds and avails be kept intact, absent the insured's exercise of his rights thereunder, for the protection and benefit of the beneficiary.

We conclude, therefore, that whether or not the cash surrender value of the policy could be exempt in the hands of the insured, he cannot be compelled to surrender the policy and thus defeat the interest of the beneficiary, and, consequently, a policy naming a beneficiary protected under the statute which the insured has not elected to surrender, is not a part of the bankrupt insured's estate and is beyond the reach of the trustee in bankruptcy.

FINLEY, C. J., HUNTER and HAMILTON, JJ., concur.

HILL and NEILL, JJ., concur in the result.

HALE, J. (dissenting)—I dissent. The 39th legislature established a procedure enabling all federal courts to certify questions of Washington law to this Supreme Court for answer by written opinion. Laws of 1965, ch. 99, p. 1302. It is called the Federal Court Local Law Certificate Procedure Act. RCW 2.60. Proceeding under the apparent auspices of this enactment, the District Court of the United States for the Western District of Washington, by order of Judge

William J. Lindberg, presiding in a bankruptcy cause, has certified to this court a question pertaining to the cash surrender of life insurance as affected by community property law.

The question so certified by the district court is:

Whether cash surrender value of life insurance as defined in Section 48.18.410 of the Revised Code of Washington is exempt property as against a Trustee in bankruptcy where the insurance policy is community property of the bankrupt and his wife, designates his wife as beneficiary thereon, and the terms of said policy reserved to the insured the absolute right to change beneficiaries without obtaining the consent of the then designated beneficiary.

RCW 48.18.410, *inter alia,* has to do with the disposition of life insurance proceeds in insolvency proceedings.

Because of the abiding spirit of mutual respect and comity long existing between the state and federal judiciary here, I would hope that we had power to answer the certified question, but I am convinced that constitutional limitations, running to the very jurisdiction of this court, forbid our doing so.

Is the Certification Statute Mandatory or Directory?

Going directly then to the constitutionality of Laws of 1965, ch. 99, p. 1302, the Federal Court Local Law Certificate Procedure Act, RCW 2.60, we should first ascertain whether the statute is directory or mandatory. RCW 2.60.020, the operative section under which the question has been certified, states:

When in the opinion of any federal court before whom a proceeding is pending, it is necessary to ascertain the local law of this state in order to dispose of such proceeding and the local law has not been clearly determined, such federal court may certify to the supreme court for answer the question of local law involved and the supreme court *shall* render its opinion in answer thereto. (Italics mine.)

If this statute is, as the majority claim, discretionary or directory and not mandatory, then we have no constitutional problem because the court can answer or not answer

as it chooses, depending upon the whims of the moment. That is, if it is directory only, this court, under such a construction, is free to answer some, all, or none of the questions certified to it, depending upon its inclinations and the state of its docket. What is now a question of constitutionality could conceivably, under a statute merely directory in nature, be simply regarded as a matter of good neighborliness. We can be good neighbors one time and indifferent ones another, and no one can charge us with a duty in any event. But if the statute is merely directory, it is a nullity anyway because it then purports to allow us to do that which the court has the option of now doing without it—make public pronouncements having no force of law on divers legal subjects.

Does the statute purport to compel this court to answer the certified question, or is compliance left to the court's discretion? The statute, I note, employs the language of compulsion or command in several places. In the foregoing section (RCW 2.60.020) it declares that this court *shall* render its opinion in answer to the question put to it. Elsewhere it uses similarly mandatory language alongside of words denoting permission.

RCW 2.60.030 (Laws of 1965, ch. 99, § 3, p. 1304), provides:

> Certificate procedure *shall be governed* by the following provisions:
>
> (1) Certificate procedure *may* be invoked by a federal court upon its own motion or upon the motion of any interested party in the litigation involved if the federal court grants such motion.
>
> . . . .
>
> (6) The supreme court *shall* forward to the federal court utilizing certificate procedure its opinion answering the local law question submitted. (Italics mine.)

as contrasted with the following permissive phraseology:

> (7) The supreme court *may* adopt rules of practice and procedure to implement or otherwise facilitate utilization of certificate procedure. (RCW 2.60.030(7)) (Italics mine.)

Thus, I am confident that the legislature has commanded the Supreme Court (1) to answer by written opinion the question submitted to it by *any* federal court concerning Washington law if (a) the law of this state on the point in issue before the federal court has not, *in that court's opinion,* been clearly determined, and (b) a clear answer as to the Washington law is, in the opinion of the federal court, necessary to a determination of the cause on hearing; (2) to take jurisdiction either (a) upon the certification of the federal court sua sponte, or (b) on the motion of any party to the federal proceedings on the federal court's approval of such application; and (3) to forward its answer to the federal court by written opinion. The statute, as I read it, leaves to the discretion of the Supreme Court of this state only the adoption of rules of practice implementing the certificate procedure.

The majority finds comfort in the idea that, if we regard the words *shall* and *may* as synonymous, it will make the statute directory. On other occasions, this court has, I realize, in ascertaining the legislature's intentions, been required to construe the mandatory word *shall* as the lexical equivalent of the permissive expression *may,* but that interpretive expedient is neither available nor advisable here for the certification statute uses both terms and in such context that they cannot possibly be synonymous. To hold that the word *shall* as used repeatedly in the statute means *may,* to me savors of pure judicial invention and bodes ill for problems of statutory construction in the future. I would be loathe to see such an interpretative expedient applied to the Decalogue.

It is apparent to me that the legislature intentionally used the word in its ordinary sense.

The dictionary says that *shall* ordinarily denotes a command, a mandate, a duty, an obligation, or a categorical undertaking or promise:

> owe, owes, ought to, must . . . will have to: . . . will be able to: can . . . used to express a command or exhortation . . . used in laws, regulations, or directives to express what is mandatory . . . used to

express what is inevitable or what seems to be fated or decreed or likely to happen in the future . . . used to express determination . . . . Webster's Third New International Dictionary (1964).

Contrastingly, the same dictionary shows that *may* in its ordinary and usual meaning denotes permission, or authority or a right enabling one to do something.

Conveying the idea of choice, option or discretion, the statute thus logically employs the permissive or directory *may* in authorizing the federal court to invoke the statute and in saying the Supreme Court "*may* adopt rules of practice or procedure" (Italics mine.), to implement or otherwise facilitate the procedure. But the same statute in denoting mandatory requirements or compulsion contrastingly uses *shall*. Thus, the employment of both terms in the same statute sensibly requires that they be given their ordinary meaning and unmistakably establishes that *shall,* as used in RCW 2.60, means "must." In construing the words as the legislature obviously intended, the meaning of the statute is left clear and the legislative intention manifest, and we need not resort to the rules of construction stated in *Faunce v. Carter,* 26 Wn.2d 211, 173 P.2d 526 (1946); and *Seattle v. Reed,* 6 Wn.2d 186, 107 P.2d 239 (1940). Rules of construction ought not be employed to becloud but rather to clarify a statute.

The words *shall* and *may* are too valuable to the law to be deprived of their meaning by interchangeable usage. If the law loses them as separate word entities, it will be hard put to find a brief, cogent substitute for either. They should, therefore, be given their ordinary meaning for it is apparent that that is the sense in which the legislature used them.

Accordingly, the words of the statute that the Supreme Court *shall* render its opinion, and *shall* forward its opinion to the federal court, and that such opinion *shall* be a written opinion which *shall* include a certificate that it is in answer to the certified question, bespeak a mandatory intent, and an explicit purpose in the legislature to direct that this court not only has but must take jurisdiction of

the controversy and must answer the certified question. Couched as it is in the language of mandate and command, the statute is not permissive or directory, but mandatory, and no amount of legalese can make the words mean differently.

There are, of course, areas in the law where it is mandatory that this court take jurisdiction, such as certiorari, mandamus, or prohibition, and in some instances habeas corpus and review on appeal in which we may constitutionally decide to go no further than the initial examination of the premises and terminate the cause short of a decision on the merits. In such cases, however, the decision-making process of the court has actually operated to decide the question of jurisdiction. The court, in granting or denying an extraordinary writ or remedy without going to the merits in cases claimed to arise under its original—or perhaps inherent—jurisdiction is actually an employment of the judicial power, for deciding the question of whether the extraordinary writ should issue or the remedy is available at all in a given case constitutes an exercise of the court's jurisdiction.

That the legislature has long recognized this concept is seen in its early enactment of RCW 2.04.020 and 2.28.150 which provide that, once the court has jurisdiction of the parties and subject matter, it shall possess all power necessary to the full exercise of that jurisdiction.

In the matter now before us, however, the statute purports to assume this judicial function by commanding this court to assume jurisdiction and to function judicially whenever a federal trial or appellate court submits a question to it in accordance with the statute. The statute thus purports to foist upon the court a jurisdiction—and a duty —not encompassed by nor included in those powers granted it in the constitution nor encompassed within its inherent or statutory powers. Being mandatory, in my opinion, it purports to compel the court unconstitutionally to perform a nonjudicial function.

## DOES THE CERTIFICATION STATUTE BREACH THE SEPARATION OF POWERS?

The most critical problem in the case, however, is not whether the statute is permissive or mandatory, but whether the legislature has trespassed upon the judicial power by legislatively abridging the Supreme Court's authority to determine the nature and extent of the judicial power under the constitution. Does the statute seek to enlarge the Supreme Court's jurisdiction? And, What is meant by "jurisdiction?"

*Blanchard v. Golden Age Brewing Co.*, 188 Wash. 396, 63 P.2d 397 (1936), states, at 412:

> By "jurisdiction" is meant the power to hear and determine, regardless of whether the ruling made in the particular case be correct or incorrect. *State ex rel. McGlothern v. Superior Court*, 112 Wash. 501, 192 Pac. 937.

That definition, for want of a better one, I still find acceptable. The ultimate power of this court as a tribunal derives from the people as prescribed by them primarily in their constitution, and from the Constitution of the United States, which all courts and judges must uphold. Courts, therefore, cannot arrogate unto themselves nor be charged by the legislative and executive branches of government with powers and duties not conferred by or imposed on them by the constitution.

When the people, by means of the constitution, created this court, they endowed it with all of the authority necessary to fulfill its function as the highest court of the state, but they gave it powers peculiar to the judiciary only. First, the constitution created a judicial system for the exercise of the judicial power, declaring

> The judicial power of the state shall be vested in a supreme court, superior courts, justices of the peace, and such inferior courts as the legislature may provide. Const. art. 4, § 1.

Then, designating the jurisdiction of the Supreme Court, the constitution stated:

The supreme court shall have original jurisdiction in habeas corpus, and quo warranto and mandamus as to all state officers, and appellate jurisdiction in all actions and proceedings, excepting that its appellate jurisdiction shall not extend to civil actions at law for the recovery of money or personal property when the original amount in controversy, or the value of the property does not exceed the sum of two hundred dollars ($200) unless the action involves the legality of a tax, impost, assessment, toll, municipal fine, or the validity of a statute. The supreme court shall also have power to issue writs of mandamus, review, prohibition, habeas corpus, certiorari and all other writs necessary and proper to the complete exercise of its appellate and revisory jurisdiction. Each of the judges shall have power to issue writs of habeas corpus to any part of the state upon petition by or on behalf of any person held in actual custody, and may make such writs returnable before himself, or before the supreme court, or before any superior court of the state or any judge thereof. Const. art. 4, § 4.

Next, the constitution prescribed the nature and extent of the jurisdiction to be vested in the trial courts, endowing superior courts of the state of Washington with virtually unlimited jurisdiction as may be seen in Const. art. 4 § 6, which declares:

The superior court shall have original jurisdiction in all cases in equity and in all cases at law which involve the title or possession of real property, or the legality of any tax, impost, assessment, toll, or municipal fine, and in all other cases in which the demand or the value of the property in controversy amounts to one thousand dollars, or a lesser sum in excess of the jurisdiction granted to justices of the peace and other inferior courts, and in all criminal cases amounting to felony, and in all cases of misdemeanor not otherwise provided for by law; of actions of forcible entry and detainer; of proceedings in insolvency; of actions to prevent or abate a nuisance; of all matters of probate, of divorce, and for annulment of marriage; and for such special cases and proceedings as are not otherwise provided for. The superior court shall also have original jurisdiction in all cases and of all proceedings in which jurisdiction shall not have been by law vested exclusively in some other court; and said court shall have the power of naturalization and to issue pa-

pers therefor. They shall have such appellate jurisdiction in cases arising in justices' and other inferior courts in their respective counties as may be prescribed by law. They shall always be open, except on nonjudicial days, and their process shall extend to all parts of the state. Said courts and their judges shall have power to issue writs of mandamus, quo warranto, review, certiorari, prohibition, and writs of habeas corpus, on petition by or on behalf of any person in actual custody in their respective counties. Injunctions and writs of prohibition and of habeas corpus may be issued and served on legal holidays and nonjudicial days.

The state constitution in this fashion prescribes the jurisdiction of the Supreme Court and the superior court. Any language purporting to grant to the legislature a power to curtail or enlarge the jurisdiction of the courts is singularly lacking in the constitution.

The Supreme Court came into being with all powers and capabilities essential to the exercise of an appellate, revisory and a specified original jurisdiction—along with certain inherent powers traditionally said to belong to the courts—as an equal, independent, but co-ordinate organ of government ordained by the constitution to execute that portion of the people's sovereignty known as the judicial power. Endowed by the people with adequate authority to fulfill its functions under the constitutions of the state and of the United States and to carry out the judicial power, the Supreme Court has neither a surplus of power nor a deficiency thereof to trespass or be trespassed upon by the executive or legislative branches of government.

Although, at its outermost edges of power, the executive authority may seemingly merge with the legislative power and the latter coalesce at its periphery with the judicial power, the mainstreams of the three have been kept separate, distinct and viable in this country for nearly two centuries. It is this separation of powers, the division of all authority of government into the executive, legislative and judicial and the allocating to each its appropriate share of the people's sovereignty which, perhaps even more than the

Bill of Rights, has been the greatest bastion of individual liberty and national strength yet devised.

*Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L. Ed. 60 (1803), holding that it was not within the power of Congress to confer upon the Supreme Court of the United States jurisdiction additional to that vested in it by the constitution, remains a basic statement of the doctrine of the separation of powers. Similarly, as this court said, in *Winsor v. Bridges,* 24 Wash. 540, 547, 64 Pac. 780 (1901):

> The distinction drawn between the federal and state governments in matters of legislation, that the former is one of delegated powers, while the latter is one of limitations, does not affect the reasoning in *Marbury v. Madison, supra,* [5 U.S. (1 Cranch) 137] as applicable to the case at bar, that this court's original jurisdiction must be measured by the constitution of the state from which it derives its existence and power.

None of the co-ordinate branches of government, under the separation of powers doctrine, may delimit or denigrate the others by assuming any of the others' basic functions and powers, nor saddle the others with functions and duties they can neither constitutionally nor organically perform.[6]

The legislature, therefore, cannot impose upon the judicial branch functions and duties outside of and beyond its constitutionally prescribed powers and duties nor disparage such powers by placing them elsewhere. See *North Bend Stage Line, Inc. v. Department of Public Works,* 170 Wash. 217, 16 P.2d 206 (1932), holding unconstitutional a statute purporting to authorize direct appeals to this court from orders of the Department of Public Works which grant or deny certificates of convenience and necessity because such procedure bypassed and ousted the superior court. Similarly, a statute which attempted to impose upon a constitutional court the duties of a board or commission was held unconstitutional because it imposed nonjudicial duties and

---

[6]For example, the Congress could not assume command of the armed forces by legislating that its designates be placed in command; nor could the President appropriate money by executive order for support and maintenance of the military establishment and thus make the armed forces totally dependent upon him.

powers on the court. *Peterson v. Livestock Comm'n,* 120 Mont. 140, 181 P.2d 152 (1947). The duty to give legal advice, of course, is vested in the Attorney General and I would think that the legislature is without power to transfer that duty to the Supreme Court.

Since the constitution of the state, in vesting all powers essential to the exercise of the appellate, revisory and original jurisdiction, has neither directly nor indirectly included among such functions a duty to render opinions to the federal judiciary nor any branch of the federal government, the legislature, I think, cannot constitutionally impose such a duty either.

### Does the Statute Merely Create a New Remedy? Is it Simply a Procedure Statute?

Although the legislature can neither enlarge upon nor curtail the jurisdiction of this court, it may adopt codes of procedure and enlarge or curtail legal and equitable remedies. It may, under the police power, as in the industrial insurance code, even remove causes of action from the area of private controversy. Or, the legislature may, for example, withdraw, alter or allow legal remedies as when it immunizes the state and its subdivisions from tort liability, or restores that liability in whole or in part. But these enactments granting or removing remedies, allowing them in whole or in part, or setting up procedures for the assertion of or creating new defenses are remedial and do not go to the essence of jurisdiction. They are statutes granting, curtailing, or changing the legal remedies and defenses available to the parties and do not delimit the court's powers to hear and determine all controversies which might otherwise lawfully come before it. Statutes which grant, disallow or alter the remedies available to the parties thus do not trench upon the ultimate power of the court as granted in the constitution. If the law allows the remedy, the legislature cannot deprive the courts of the power to enforce it; if the law denies the remedy, the courts may not grant it.

Thus, the statute before us does not simply provide a procedure to implement the exercise of an existing function of the court, for this court up to now has been under no duty to either accept or pass upon questions presented to it from the federal courts nor has it been under any duty to treat the federal litigants as parties to a pending state action. Nor does the statute merely establish a procedure whereby the Supreme Court exercises its jurisdiction to carry out its constitutional functions, for the court has never had either the jurisdiction or inclination to declare the law except in cases coming before it in its appellate, revisory and original jurisdiction.

Thus, in directing this court to answer questions put to it by the federal judiciary, the legislature has neither afforded the parties to actions in the state courts new legal and equitable remedies or defenses nor simply provided implementing procedural remedies, but, in my judgment, has sought to fundamentally change the function of the Supreme Court. If the legislature may require the Supreme Court to answer questions put to it by the federal judiciary, it may also in similar fashion foist upon the court all manner of duties and functions not in consonance with or in aid of the court's original, revisory or appellate jurisdiction.[7] It could, under the guise of enacting procedural or remedial legislation, even impose upon the court duties and functions which the court would be incapable of discharging.

The certification statute, I would conclude, being neither procedural nor remedial, purports to run directly to and affects the jurisdiction of the court. It puts a duty upon the

[7]Examples coming readily to mind from current events: The legislature might compel the court to sit as an arbitrator in disputes between management and labor; to draw up and decree the establishment of legislative and congressional districts when the legislature fails to do so; to prejudge the constitutionality of impending legislation, thus involving the court in the political process of legislating; to decide in advance of publication whether writings are libelous or obscene; and to fix rates for public utilities and grant or deny licenses; or to determine the constitutionality and effect of proposed initiative and referendum measures before their adoption by the people. See *State ex rel. O'Connell v. Kramer*, 73 Wn.2d 85, 436 P.2d 786 (1968).

court derived neither from its power to issue writs of mandamus, review, prohibition, habeas corpus or any other writ necessary and proper for the complete exercise of its appellate and revisory jurisdiction (Const. art. 4, § 4), nor from any inherent powers said to repose in a constitutional court. This court never having been accorded revisory and appellate jurisdiction over the federal judiciary, cannot be granted or required to assume such powers by the legislature—even through a procedural statute. In brief, the legislature cannot constitutionally, in the guise of procedural legislation, curtail or enlarge the jurisdiction of the Supreme Court. *North Bend Stage Line, Inc. v. Department of Public Works,* 170 Wash. 217, 16 P.2d 206 (1932); *Darnell v. Noel,* 34 Wn.2d 428, 208 P.2d 1194 (1949); *State v. Estill,* 55 Wn.2d 576, 349 P.2d 210 (1960). The court's power to hear and determine any cause properly cognizable by it under its revisory, appellate, or original jurisdiction—along with certain inherent powers—derives from the constitution and comprises the whole of its jurisdiction.

## Is the Controversy Certified To This Court Justiciable?

Closely related to the question of separation of powers is that of justiciability. The Supreme Court does not hear nonjusticiable controversies; nor should it give purely advisory opinions. *Brehm v. Retail Food & Drug Clerks Union,* 4 Wn.2d 98, 102 P.2d 685 (1940); *Grill v. Meydenbauer Bay Yacht Club,* 57 Wn.2d 800, 359 P.2d 1040 (1961); *Hutchinson v. Port of Benton,* 62 Wn.2d 451, 383 P.2d 500 (1963). Recently this court in *State ex rel. O'Connell v. Kramer,* 73 Wn.2d 85, 436 P.2d 786 (1968), was asked to rule upon the constitutionality of a proposed initiative measure filed with the Secretary of State to call a state constitutional convention. Holding that, since the proposed measure had not yet been enacted by the people, the controversy thus posed was not justiciable and the decision sought would be an advisory opinion, we said:

> Ultimate questions as to the validity of the proposed initiative measure are not before us and should not come

before us unless and until the people have enacted the measure into law, for the Supreme Court does not render advisory opinions. Even in *National Elec. Contractors Ass'n v. Seattle School Dist. No. 1,* 66 Wn.2d 14, 400 P.2d 778 (1965), and *Deaconess Hosp. v. State Highway Comm'n,* 66 Wn.2d 378, 403 P.2d 54 (1965), where this court reviewed the first case after an intervening mootness and in the latter where a long and expensive trial had occurred in a county which some of the judges felt was without jurisdiction, the court asserted again that it does not render advisory opinions or decide purely theoretical controversies. There being before us no statute, or initiative measure enacted by the people, the proposed measure presents no justiciable controversy and we, therefore, do not pass upon its validity.

Because the judicial power is reserved for judicial purposes only, the legislature cannot require of or impose upon the judiciary a duty to perform executive, administrative, legislative or political functions or to decide abstract questions of law. 16 Am. Jur. 2d *Constitutional Law* § 219. Therefore, if the statute brings nonjusticiable controversies before the court, it is unconstitutional as one imposing upon the court a function not embraced within but being clearly outside the judicial power.

Likewise, a procedure which calls for decisions or pronouncements of academic, or theoretical, or philosophical, or, in some instances, possibly administrative and political questions, engenders nonjusticiable controversies and changes the function of this court from judicial to something else. Decisions falling within these realms belong to the executive and legislative branches of government and are thus outside the competence or jurisdiction of the judiciary.

If the judgment of a court does not effectively operate upon or bind the parties to the action, or has only a theoretical rather than an actual effect upon them, or does not "have the force and effect of a final judgment in law or decree in equity upon the rights, status or other legal relationships of one or more of the real parties in interest," it is not a justiciable controversy. *State ex rel. O'Connell .v.*

*Dubuque,* 68 Wn.2d 553, 413 P.2d 972 (1966). Nothing in the federal statutes, constitution or decisions has been brought to my attention which makes binding upon the federal courts our answer to their certified question. The district court remains free to apply our answer or to disregard it, or to apply it in part and to reject it in part.

I do not suggest that the federal courts will abuse the certification procedure, or give our answer to the certified question other than the most careful and painstaking consideration, but this does not obscure the legal reality that the federal court may juridically regard our answer as neither binding upon it nor upon the parties to the action on trial. Nor do I know of any procedure whereby a litigant who, believing that a federal court had misapplied, misunderstood or declined to follow the answer to the certified question, can appeal to this court for a review or determination of those issues. I would not overlook either a probability in some instances that the moving party to a federal cause, having obtained a judicial opinion from this court, has the option to and will dismiss his case there, thus our opinion would be suspended in thin air, making of it a mere exercise in academics.

It has long been the rule that, unless the Constitution of the United States or federal statutes otherwise require, "The laws of the several states . . . shall be regarded as the rules of decision in civil actions in the courts of the United States, in cases where they apply." Rules of Decision Act, 28 U.S.C. § 1652 (1 Stat. 73, 92, Sess. 1, ch. 20, § 34). *Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 18 L. Ed. 2d 886, 87 Sup. Ct. 1776 (1967). Judicial decisions are an integral part of the laws of the several states when announced by the highest state court (*Erie R. R. v. Tompkins,* 304 U.S. 64, 82 L. Ed. 1188, 58 Sup. Ct. 817, 114 A.L.R. 1487 (1938); *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 93 L. Ed. 1528, 69 Sup. Ct. 1221 (1949); *King v. Order of United Commercial Travelers of Am.,* 333 U.S. 153, 92 L. Ed. 608, 68 Sup. Ct. 488 (1948)), for the state's highest court is the best authority for state

law. And, if there be no decision on the precise point in issue before the federal court, then, as the Supreme Court said in *Commissioner of Internal Revenue v. Bosch, supra,* citing *Bernhardt v. Polygraphic Co. of Am.,* 350 U.S. 198, 100 L. Ed. 199, 76 Sup. Ct. 273 (1956), "federal authority must apply what it finds to be the state law after giving 'proper regard' to relevant rulings of other courts of the State. In this respect it may be said to be, in effect, sitting as a state court." These well-established rules, recognizing as they do the supremacy of state decisional law in state questions, do not, however, convert a federal case into a state case, nor would they make our answer determinative of the state question in the federal case.

The *Erie* doctrine, in holding the decisions of the highest courts of the states to be binding upon the federal courts in civil cases, under the Rules of Decision Act, 28 U.S.C. § 1652, does not thereby confer upon the state courts any fragment of jurisdiction or control over the parties to the federal action. Jurisdiction, under *Erie, supra,* thus cannot be said to be shared between the state and federal courts. Neither in a case involving diversity of citizenship in the federal courts nor under the present Certificate Procedure Act does this court have the power to intervene or render a final decision as to state law and make it binding upon the parties.

Thus, I think the certificate procedure fails to present a justiciable controversy to this court within our constitutional requirements and would require of us an answer in the nature of an advisory opinion, for the judgment of this court becomes binding neither upon the federal court nor upon the parties to the action. Where a court entertains a legal question or determines a point of law without the requirements of justiciability, it is no longer, in my opinion, performing a judicial function, and I do not believe the legislature can, under our constitution, compel the courts to carry out nonjudicial functions.

## Should the Court Answer the Certified Question as a Matter of Comity?

It is argued that, putting aside questions of constitutionality, this court ought to answer the certified question in promoting an advance in judicial administration and as a matter of comity. But, despite the traditional good will and high esteem in which our brothers of the federal judiciary are here held and recognizing the high judicial purpose governing the certifying of the question, it is obvious that considerations of comity or judicial administration ought not be allowed to override basic constitutional limitations. The idea of comity is an appealing one but I think requires no further comment. But whether the certification statute, if constitutional, constitutes a step forward in judicial administration is to my mind very doubtful.

Two states have certification procedure statutes which have been held valid under their respective constitutions. *In re Richards,* 223 A.2d 827 (Me., 1966); *Sun Ins. Office v. Clay,* 133 So.2d 735 (Fla., 1961). See Addendum. But the delays, expense and uncertainties inherent in that procedure evidenced by the cases in which the statutes were invoked provide neither an impressive basis for recommending the statute as a matter of comity between courts nor as a practical expedient to promote the prompt dispatch of judicial business. Incidentally, I think these cases supply us with little assurance that the statute in issue here is a constitutional exercise of legislative power under the state constitution, either. See Addendum.

The majoirty opinion suggests that the certification statute will usher in a new era of efficiency and speed up the now ponderous and sometimes seemingly immobile processes of the law, but this idea seems hardly borne out by the experiences cited. If there ever was a way in which to delay a case as it moves slowly through the courts, in my opinion, it would be the very procedure whereby at one stage the case comes to a halt in the federal system, moves over into the state system to await docketing, briefing, hearing, writing, filing of the opinion and petition for re-

hearing and then moves back again into the system of origin to take its place on the judicial conveyor for resumption of proceedings in the federal system. I think a reading of all cases cited in the majority opinion and commonsense as well will demonstrate that the certification procedure is a dilatory one and in the long run compounds the very delays it is claimed to help curtail and magnifies the uncertainties it is claimed to eliminate.

It seems to me also that the majority opinion overlooks another deficiency engendered by the statute. What will happen in those cases where this court has actually changed the law of this state, or feels obliged to do so? Will this court be obliged to adhere to the old rules because it has solemnly promised the federal judiciary that the law is as declared in the answer to the certified question? Examples of marked changes in the law as declared by this court come readily to mind: In *Siragusa v. Swedish Hosp.*, 60 Wn.2d 310, 373 P.2d 767 (1962), we departed from a long-held rule and modified the assumption of risk doctrine in ruling that that doctrine had no application to an employee or servant when the master or employer was negligent in creating a dangerous condition.

Or, in another case, had we certified to a federal court in 1952 that a paying patient in a charitable hospital could not recover from the hospital for the negligence of a hospital nurse, would we, in 1953, have been in a position to strike down the virtual immunity from tort liability theretofore applicable to charitable hospitals as was done in *Pierce v. Yakima Valley Memorial Hosp. Ass'n*, 43 Wn.2d 162, 260 P.2d 765 (1953)? Or, in *Pederson v. Dumouchel*, 72 Wn.2d 73, 431 P.2d 973 (1967), would this court have been free to adopt new standards of due care in the practice of medicine and change the long-held rule from medical standards of the community to standards of practice in essence for the state at large? There are, of course, other examples of changes in the law as declared by this court engendered by experience, reason and changing conditions in our society. When this court is compelled to answer a certified question

as to the state of the law, is it free to answer what the law is, is in the process of becoming, should be, or in the future will likely become? Consideration of these questions alone should rule out the certification statute if it depends on comity or policy.

Accordingly, I would conclude that Laws of 1965, ch. 99, p. 1302, the Federal Court Local Law Certificate Procedure Act, RCW 2.60, is unconstitutional because (1) it purports to expand the jurisdiction of the Supreme Court beyond the powers granted it in the constitutions of the State of Washington and the United States, (2) it subjects the Supreme Court to regulation by the legislature beyond permissible procedural and purely remedial enactments and amounts to a trespass upon the judicial power by the legislative power, and (3) it imposes a function upon the Supreme Court which is not a true exercise of judicial power, but, on the contrary, calls upon this court to render decisions in the nature of advisory opinions and requires the court to entertain nonjusticiable controversies.

WEAVER and McGOVERN, JJ., concur with HALE, J.

ADDENDUM

Florida enacted a Certificate Procedure Act in 1945. Fla. Stat. Ann. § 25.031. Not until 1959, 14 years after its adoption, when Professor Kurland's paper, *Toward a Cooperative Judicial Federalism: The Federal Court Abstention Doctrine,* 24 F.R.D. 481 (1959), referred to it did the enactment get much professional attention. The case of *Clay v. Sun Ins. Office,* 363 U.S. 207, 4 L. Ed. 2d 1170, 80 Sup. Ct. 1222 (1960), set in motion the first test of the Florida statute when the Supreme Court of the United States remanded to the court of appeals with directions to certify state law questions to the Florida Supreme Court. Heeding these directions, the Court of Appeals, for the 5th Circuit, invoked the Florida certification procedure statute, by certifying to the Supreme Court of Florida two questions on state law concerning the legal effect of willful injury and the statute of limitations on a policy of insurance.

In 1961, the Supreme Court of Florida, responding to the questions from the Court of Appeals, for the 5th Circuit, sustained the constitutionality of the state's certification procedure act (Fla. Stat. Ann., § 25.031), and answered the certified questions. It raised the constitutional question sua sponte. *Sun Ins. Office v. Clay,* 133 So.2d 735 (Fla., 1961). The court of appeals, however, notwithstanding its adoption of the certification procedure and the ruling on its constitutionality by the highest state court, held that the Florida statute of limitations could not constitutionally apply to the insurance policy in issue and that the

Supreme Court of Florida's opinion was also advisory and not binding upon the parties or the certifying court. The court of appeals, therefore, declined to apply the answers to the case in issue. *Sun Ins. Office v. Clay,* 319 F.2d 505, 508 (5th Cir., 1963). On certiorari, the Supreme Court of the United States again reversed, this time on the merits. *Clay v. Sun Ins. Office,* 377 U.S. 179, 12 L. Ed. 2d 229, 84 Sup. Ct. 1197 (1964).

The torturous path a simple case may take under certification of question is illustrated, too, in *Aldrich v. Aldrich,* 378 U.S. 540, 12 L. Ed. 2d 1020, 84 Sup. Ct. 1687 (1964), in which the Supreme Court of the United States, in reviewing a divorce decree from West Virginia, certified a question to the Florida Supreme Court as to the effect of a Florida divorce decree awarding alimony, and on the basis of that court's answer reversed the Supreme Court of West Virginia. See Kaplan, *Certification of Questions From Federal Appellate Courts to the Florida Supreme Court and its Impact on the Abstention Doctrine,* 16 U. of Miami L. Rev. 413 (1962); 48 Iowa L. Rev. 185; 40 Tex. L. Rev. 1041, for discussion of the earlier analysis of certification procedure. Maine recently adopted a certification procedure, 4 M.R.S.A. § 57, and its Supreme Court, in *In re Richards,* 223 A.2d 827 (Me., 1966), upheld the constitutionality of the statute, declaring its participation in the certification procedure to constitute a valid exercise of judicial power.

The Maine Supreme Court, in sustaining the constitutionality of the state's new certification act, alluded to, and I felt in large part was persuaded by, Me. Const. art. 6, §§ 1 and 3, which provided:

> The judicial power of this State shall be vested in a Supreme Judicial Court, and such other courts as the Legislature shall from time to time establish. Maine Const. art. 6, § 1.

> The Justices of the Supreme Judicial Court shall be obliged to give their opinion upon important questions of law, and upon solemn occasions, when required by the Governor, Senate, or House of Representatives. Me. Const. art. 6, § 3.

Washington has no constitutional provision requiring advisory opinions of the courts.

Texas has no certification procedure statute, but its Supreme Court had before it a question of law referred to it in effect by the Fifth Circuit Court of Appeals. In an opinion applying the doctrine of abstention, the court of appeals directed the litigants in the federal court to seek a declaratory judgment in the court of last resort of the state of Texas. The court of appeals retained jurisdiction of the case. Whereupon, the litigant in the federal case brought suit for a declaratory judgment under the Texas Uniform Declaratory Judgment Act (Vernon's Ann. Civ. St., art. 2524-1).

Affirming a dismissal for want of jurisdiction, notwithstanding the constitutionality of the declaratory judgment procedure, the Supreme Court of Texas, in *United Servs. Life Ins. Co. v. Delaney,* 396 S.W. 2d 855 (Tex., 1965), holding the opinion sought to be merely advisory said, at 860:

> We have no doubt that, in keeping with the Erie decision, the federal court would render a judgment in keeping with our interpre-

tation of Texas law in this case, but the question is not one of comity, nor of federal policy. It is a question of the power, authority and jurisdiction of the state courts under the Texas Constitution. . . . Here, in effect, the same suit is pending in both the state and federal courts by reason of a directive which contemplates that the final judgment will be rendered by a federal court. The Circuit Court's reservation of jurisdiction to render final judgment renders these proceedings advisory in nature.

Holding the court to be "confronted with a constitutional lack of power," the court added:

Actually what we are called upon to do is to answer a question and not render a judgment.

WEAVER, J. (dissenting in part)—I have signed Judge Hale's dissent, but I wish to add some thoughts of my own. A few years ago, I opened my dissent to an en banc decision[8] with a quotation:

I have the misfortune to differ from the Lord Justice *Cotton*, and I do so with a deep sense of the probability that he is right. Bowen, L.J., *In re Haseldine*, 31 Ch.D. 511, 517 (1886).

After due consideration, I agree with the cogent arguments set forth in the dissenting opinion, which holds unconstitutional the statute under consideration. I do so for the simple reason that the majority opinion stretches my understanding of our state constitution, as it now exists, beyond permissible bounds.

I agree, wholeheartedly, with the philosophy that it is incumbent upon the judiciary ever to be vigilant to promote all the possible means for the improvement of judicial administration; but it must be done by the adoption of those means that do not violate constitutional principles.

I fear that the statute is not the nostrum outlined by the majority opinion; and I also fear that the thesis and reasoning of the majority opinion will lead the court into a legal labyrinth of suggested changes, statutory or otherwise, from which it cannot extricate itself without a complete reexamination and perhaps reversal of the decision treating with the problem before us.

---

[8] *Adler v. University Boat Mart, Inc.*, 63 Wn.2d 334, 343, 387 P.2d 509 (1963).

In my extracurricular reading, I stumbled across a quotation, gleaned from the dissent of Clarkson, J., in *Oliver v. Raleigh*, 212 N.C. 465, 471, 193 S.E. 853 (1937):

> I know that this, like every other case, will become the parent stock from which a motley progeny will spring. In those after years when this case, elevated to high authority by the cold finality of the printed page, is quoted with the customary "It has been said," perchance another Court will say, "Mayhaps the potter's hand trembled at the wheel." Possibly when that moment comes these words may give that Court a chance to say, "Yea, and a workman standing hard by saw the vase as it cracked."

The majority opinion is "parent stock." Its progeny can be earth-shaking in the development of judicial administration in this state.

Judge Hale, in his dissent, with commendable foresight, has "seen the vase as it cracked." He has alerted us.

Finally, the majority opinion disposes of the instant question upon the merits. (I refrain from saying "case," for I do not believe we have a justiciable question before us that is within our jurisdiction.)

If we reach the merits of the instant question, I agree with the disposition made by the majority opinion.