[No. 36568.    En Banc.    December 5, 1963.]

EARLINE L. ADLER, *as Administratrix, Respondent*, v.
UNIVERSITY BOAT MART, INC. *et al., Appellants.*

*Reported in 387 P. (2d) 509.

*Kenneth O. Welling*, for appellants.

*Lawrence M. Ross* (of *Griffin, Boyle & Ross*), for respondent.

HILL, J.—This is an appeal from a judgment for the plaintiff in a wrongful death action.

The defendant, Robert E. Richardson, President of the defendant University Boat Mart, Inc. (who will be hereafter referred to as though he were the sole defendant), rented an 18-foot plywood boat with outboard motor to Gerald Millholland. Richardson had assured Millholland that the boat was suitable for cruising from Tacoma to the San Juan Islands.

When Millholland took delivery at the Boat Mart in Lake Union, he had with him his 10-year-old son and two adults, Oscar Williams and Robert Paul Adler. They started for Tacoma at about 7 p.m. The trip was uneventful until, off Point Robinson, water was discovered in the cockpit. They were unable to find anything with which to bail the rapidly rising water. It was decided that Williams and Adler should go forward and sit on the bow in an effort to bring the stern up higher in the water. The boy was sitting on the portside and Millholland was standing on

the starboard side operating the controls; Williams went to the portside in order to climb around the windshield on his way forward; and Adler, instead of going to the starboard to keep the boat in trim, followed him to the portside. The weight of the two men and the boy on the portside and the water in the cockpit also shifting to that side, caused a sudden list, and the two men and the boy were thrown into the water. The boy wore a life jacket and Williams had two buoyant cushions, one of which he immediately gave to Adler. Millholland, seeing his son thrown into the water, jumped to his assistance, leaving the throttle open and the boat in gear. It circled its former occupants twice and then went away from them. The engine ran for 4 or 5 minutes; the mast lights were visible for another 4 or 5 minutes; and then it was no longer visible.

The tanker *Dispatch* came along about an hour[1] later and picked up Williams and, then later, Millholland and the boy; but, though an extensive search was made and a buoyant cushion was floating in the water, Adler was never found. (There were only three buoyant cushions and each of the men had had one.)

The next morning the boat was found upside down on a beach. A patch in the bottom of the hull, which had been applied 7 years earlier, was loose at one end; other than this there was no serious damage to the hull.

This action was brought by Earline Adler, as administratrix of the estate of Robert Paul Adler, deceased, under the wrongful death statute. RCW 4.20.010, 4.20.020.

It was tried to the court, and the court found for the plaintiff both on the theory of negligence, *i.e.*, that the defendant was negligent in failing to properly inspect the boat, as the defective patch should have been discovered on a proper examination; and on the theory of an express and implied warranty of fitness.

The defendant urges 18 assignments of error, but the decisive issues are: (a) whether the evidence established

---

[1]Williams testified that they stayed fairly close together for about 30 minutes; then he left the others in an effort to swim to shore and about 25 minutes later was picked up by the *Dispatch*.

the death of Adler; (b) whether negligence of the defendant, which was the proximate cause of Adler's death, was established; (c) whether Adler was contributorily negligent in overloading the portside of the boat; (d) whether Millholland's abandoning the boat was a superseding cause of Adler's drowning ("d" assumes that had Millholland stayed with the boat Adler and the others would probably have been rescued immediately); and (e) whether there was both an express and implied warranty of suitability of the boat, delivered by the defendant to Millholland, for cruising in Puget Sound.

We will consider these issues in that order:

■ *(a) Evidence of death of Adler*: The contention that the body of Adler not having been recovered death could not be proved, without the presumption afforded by the lapse of 7 years, is without merit. Death, like any other fact, may be proved by circumstantial evidence. *Harris v. Security Benefit Ass'n* (1935), 185 Wash. 25, 52 P. (2d) 329; *Fordyce v. Modern Woodmen of America* (1924), 129 Wash. 364, 225 Pac. 434; *Brownlee v. Mutual Ben. Health & Accident Ass'n* (C.C.A. 9th, 1928), 29 F. (2d) 71; *Continental Life Ins. Co. v. Searing* (C.C.A. 3rd, 1917), 240 Fed. 653; *Harvey v. Fidelity & Cas. Co.* (C.C.A. 6th, 1912), 200 Fed. 925, *cert. denied* 229 U. S. 614 (1913); *Veselsky v. Bankers Life Co.* (1928), 248 Ill. App. 176; *In re Conover's Will* (1958), 13 Misc. (2d) 731, 177 N.Y.S. (2d) 75; 61 A.L.R. 1327, 1330-31 (1929); 25 C.J.S. Death, § 9 (1941).

■ Adler was last seen when the small boat from the *Dispatch* approached Millholland and his son. After they had been taken aboard, a thorough search was conducted but only a buoyant cushion could be found. Adler had been, at that time, a mile and a half from shore and had been in the cold water an hour. The other two men were suffering from exposure when rescued. There is no suggestion of any reason why he should want to disappear. It seems to us that the court could have reached no other reasonable conclusion than that Adler had drowned.

*(b) Negligence of defendant*: The negligence of the defendant, as found by the trial court, centered around the

patch in the forward starboard hull, one end of which was found to be pushed inboard when the beached boat was found the morning after the tragedy.

The trial court found that though the defendant knew of the patch, he

". . . did not consider the existence of said patch as significant nor did he sufficiently or properly test or examine patch or hull for soundness,"

and that this also applied to the defendant's repairman. The trial court further found:

"That there existed near the end of said patch, at said time, a condition known as 'dry rot', which condition had wasted the wood of the hull on the edge of such patch and caused the said patch to become unsound. That said condition was discoverable at said time under proper examination and testing."

If there was dry rot, the evidence was conclusive that it would be readily discovered if the patched area was tapped soundly.

█ Where a trial court's findings are supported by substantial evidence, they will not be disturbed on appeal. *Hoke v. Stevens-Norton, Inc.* (1962), 60 Wn. (2d) 775, 375 P. (2d) 743. (We stated this proposition at least eight times in the last complete volume of our reports, *i.e.*, 60 Wn. (2d)).

The trial court further found that the boat was filling rapidly with water which, unknown to its occupants, was entering the hull through the defective patch; and, fearful that the craft would founder by the stern, it was agreed that Williams and Adler would go forward to the bow to level the craft.

██ The defendant asserts that the trial court's finding, that the water in the craft which imperiled it came through the defective patch, is mere conjecture.

On the contrary, we think it was not only a permissible inference, but the only inference that a disinterested person could draw.

The constantly rising water in the boat was in no wise conjectural; the defendant's suggestion that it might have

come over the transom, has no support in the evidence; and four witnesses agree that when the boat was found upside down on the beach, the integrity of the hull was not impaired except for the patch. As we said in *DeYoung v. Campbell* (1957), 51 Wn. (2d) 11, 16, 315 P. (2d) 629, 632:

"Circumstantial evidence is proof of certain facts and circumstances, from which may be inferred other and connected facts that usually and reasonably follow according to the common experience of mankind. It is unquestioned that proximate cause may be adduced as an inference from other facts proven. *Wilson v. Northern Pac. R. Co.*, 44 Wn. (2d) 122, 265 P. (2d) 815 (1954)."

The evidence reasonably excluded the possibility that the water, which was filling the boat, came from any other source than the defective patch.

*(c) Contributory negligence of Adler*: The defendant contends that when Adler followed Williams to the portside of the boat, for the purpose of making his way forward to the bow, an excess of weight was placed on that side. This was responsible for the listing of the boat which threw the two men and the boy into the water. Adler was, therefore, contributorily negligent.

There was no testimony as to Adler's familiarity or experience with boats. We have, on numerous occasions, quoted the following statement from 1 Blashfield, Cyclopedia of Automobile Law and Practice § 668, p. 538 (Perm. ed. 1948).

"When one is confronted with a sudden peril requiring instinctive action, he is not, in determining his course of action, held to the exercise of the same degree of care as when he has time for reflection, . . ."

*Poling v. Charbonneau Packing Corp.* (1954), 45 Wn. (2d) 845, 852, 278 P. (2d) 375, 379; *Dupea v. Seattle* (1944), 20 Wn. (2d) 285, 290, 147 P. (2d) 272, 275; *American Products Co. v. Villwock* (1941), 7 Wn. (2d) 246, 256, 109 P. (2d) 570, 575, 132 A.L.R. 1010.

Whether a reasonably prudent and cautious man faced with the apparent necessity of getting forward as rapidly as possible, when it was thought the craft might founder by the stern, should have realized the necessity of keeping

it trim weight wise between the port and starboard sides, seems to us an issue that could not be determined as a matter of law. As Judge Cardozo said, in *Wagner v. International R. Co.* (1921), 232 N. Y. 176, 182, 133 N. E. 437, 438,

"  .  .  . 'Errors of judgment,' however, would not count against him, if they resulted 'from the excitement and confusion of the moment' (*Corbin v. Philadelphia*, 195 Penn. St. 461, 472). The reason that was exacted of him was not the reason of the morrow. It was reason fitted and proportioned to the time and the event."

See, also, 2 Restatement, Torts § 470 (1934); 2 Harper & James, Torts § 16.11 (1956); Prosser, Torts § 32, 137 (2d ed. 1955).

Adler's contributory negligence, as an issue of fact, was determined adversely to the defendant, and there is no basis for an interference with that finding.

*(d) Superseding cause*: The defendant also urged that the act of Millholland in abandoning the boat was a superseding cause of Adler's death, thus relieving him of any liability.

Defendant's contention must, of necessity, rest on the premise that had Millholland remained with the boat Adler would not have drowned. This assumes that Millholland could have clung tenaciously to the boat and subsequently righted it, and then maneuvered it through the rescue operation of getting both men and the boy aboard. It leaves unanswered the further question of how long it would have remained afloat.

Assuming arguendo that Millholland's act was a cause of Adler's drowning, we fail to see how it protected the defendant from liability. The rule which we have frequently applied is found in 2 Restatement, Torts § 439, p. 1184 (1934):

"If the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another, the fact that the active and substantially simultaneous operation of the effects of a third person's innocent, tortious or criminal act is also a substantial factor in bringing about the harm does not protect the actor from liability."

See, *e.g.*, *Greenleaf v. Puget Sound Bridge & Dredging Co.* (1961), 58 Wn. (2d) 647, 655, 364 P. (2d) 796, 802; *Theurer v. Condon* (1949), 34 Wn. (2d) 448, 463, 209 P. (2d) 311, 319; *Eckerson v. Ford's Prairie School Dist. No. 11* (1940), 3 Wn. (2d) 475, 484, 101 P. (2d) 345, 350.

See, also, 2 Restatement, Torts § 444, p. 1191 (1934):

"An act done by another in normal response to fear or emotional disturbance to which the actor's negligent conduct is a substantial factor in subjecting the other is not a superseding cause of harm done by the other's act to himself or a third person."

In abandoning the boat Millholland reacted instinctively, and it was a normal response to the fear and emotional disturbance which resulted from witnessing his young son being thrown overboard. See *Russo v. Dinerstein* (1951), 138 Conn. 220, 224, 83 A. (2d) 222, 224, and cases cited therein. Discussing the situation in which Millholland found himself, the trial court said:

"Counsel for the defendant says the boy was not in any danger because he had the lifejacket on, and the father should have realized this and should have stayed aboard. Even though the boy had the lifejacket on, I think that any parent would be concerned as to the adequacy of the support the lifejacket might give.

"But there is another phase which might give us reason for concern. This was at night. A human being floating in the water at night is not visible for any great distance, and if for any reason the father would not have been able to stop immediately, it is possible that he and the boy would have been separated, or the father would have at least worried about the boy being separated from him. And while he could well say Mr. Millholland might have exercised better judgment by putting the boat into neutral or stopping it entirely and using the one line that was aboard for use at the locks, on the other hand I don't think we can say that his act was a negligent act in immediately going to the aid of the boy and abandoning the boat."

We have, under the preceding subdivision, *i.e.*, (c), discussed the only contributory negligence by Adler to which reference is made in the defendant's brief; and we have, under this subdivision, *i.e.* (d), discussed the only superseding cause to which reference is made in that brief. There

comes, however, the suggestion that if water was coming in through the defective patch, any one of the three men on the boat could have discovered the source of that water had he looked. [2]

If the failure to discover the source of the water was negligence on the part of Millholland or Williams, it cannot be imputed to Adler. Whether Adler was negligent, under the circumstances then existing, for failure to take up the cabin flooring to look for the source of the water entering the boat instead of attempting to go forward to hold down the bow of the boat, as suggested by Millholland (who was operating the boat), is certainly not for our determination on this appeal.

If Millholland's negligent failure to look for the source of the water or to stay with the boat is to be regarded as a superseding cause, his conduct falls squarely within both (b) and (c) of 2 Restatement, Torts § 447, p. 1196 (1934):

"The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if

"(a) the actor at the time of his negligent conduct should have realized that a third person might so act, or

"(b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or

---

[2] This suggestion is not only not argued, but is not sustained by the evidence. The patch was under the floor boards of the cabin, and the water coming in would have to be seen through the floor boards. Whether the flooring was slats, as in the cockpit, or something more substantial, does not appear from the testimony. When they discovered that the boat was settling in the water, it was dark in the cockpit and unquestionably darker in the cabin. Millholland was doing the steering and operating the boat, and the evidence does not indicate that he entered the cabin. Williams had earlier spent some time in the cabin with the boy, but, when the boy became ill, took him to the cockpit. It was thereafter that the difficulties began. Williams later returned to the cabin with Adler to look for something with which to bail; Williams testified that he saw no water in the cabin at that time. Not finding anything with which to bail, Williams and Adler then started their ill-fated attempt to go forward.

"(c) the intervening act is a normal response to a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent."

*(e) Express or implied warranty of suitability*: Since the judgment can be affirmed on the basis of what has already been said, it is unnecessary to consider whether there were warranties, express or implied, or their availability to the plaintiff.

In addition to the foregoing issues, (a) through (e), which bear upon the plaintiff's right of recovery, the defendant raises an issue as to the admissibility of certain testimony. An objection was sustained to the following question (put to the plaintiff):

"Do you know whether there is a practice among people who sell or lease boats to inspect such boats by withdrawing screws from patches in order to examine the screws?"

The basis for sustaining the objection was that the practice of those who sell or lease boats is immaterial, and moreover would not be a proper standard.

What the practice of persons not shown to be qualified might be is of no probative value, and the objection was on its face properly sustained.

No offer of proof was made to give the trial court any clue as to any possible materiality.

Further, we can see no possible prejudice. If the expected answer was that there was such a practice, admittedly the defendant and the defendant's repairman had withdrawn no screws from the patch to examine them; and if the answer was that there was not such a practice, no one was contending that the defendant's failure to withdraw screws constituted negligence. The evidence was that a sound tapping of the patch would have disclosed the dry rot.

The judgment is affirmed.

FINLEY, ROSELLINI, HUNTER, HAMILTON, and HALE, JJ., and POYHONEN, J. Pro Tem., concur.

WEAVER, J. (dissenting)—

"I have the misfortune to differ from the Lord Justice *Cotton,* and I do so with a deep sense of the probability

that he is right. . . ." Bowen, L.J., *In re Haseldine,* 31 Ch.D. 511, 517 (1886).

The above describes my state of mind after reading plaintiff's evidence and briefs, studying the exhibits, listening to oral argument, and studying the majority opinion.

I cannot, however, bring myself to the conclusion that defendant's negligence was the proximate cause of Mr. Adler's death. Stated differently, I believe the facts are sufficient to place this case under the rule that

"The defendant will ordinarily be relieved of liability by an unforeseeable and abnormal intervening cause which produces a result which could not have been foreseen." Prosser, Law of Torts (2d ed. 1955) § 49, p. 266.

I grant that the rule is one of limited application

". . . and it is only when they [intervening acts of third parties] are so foolhardy or unusual that they cannot be regarded as any normal part of the risk, that they will be considered a superseding cause." (Ibid. § 49, p. 272).

The boat was made of wood; it did not sink; there is no question of the boat remaining afloat. It was found about 5 a. m. the next morning upside down on the beach of Maury Island. The 35-horsepower motor was on the transom; gas cans, fuel, a fire extinguisher and ". . . a few other things, personal gear . . ." were still aboard.

One who operates a boat on navigable waters claims for himself, and indicates to those who accompany him, some knowledge and competence in its operation. The record is devoid of any indication that Mr. Millholland, the operator, had any previous experience. I have not overlooked his statement that

". . . when it [the boat] hit a choppy condition it would slap down, but I was used to it and it did not concern me at all."

The crux of plaintiff's case is defendant's negligence in renting a boat with a defective patch on the bottom. A number of plaintiff's witnesses described the patch. It is illustrated by numerous photographs.

Exhibit No. 13, introduced by defendant, is a portion (approximately 2¾ feet by 2¼ feet) of the boat's plywood bottom and a section of the keel to which it is attached.

The patch in question, inserted into the hull, is 8½ inches by 15 inches. The patch is in the cabin, between frames 3 and 4, thus forward of the bulkhead between the cabin and the cockpit. The butt block, placed over the patch on the inside of the hull, is 13 inches by 20 inches. The inboard edge of the butt block is 2 inches from the keelson.

The afterend of the patch and the corresponding 2-inch overlap of the butt block are separated from the hull and push inward. The break extends an additional 5½ inches so that the opening is approximately 14 inches athwartship. This extends the break 4 inches beyond the butt block inside the hull. The trial court observed:

"The testimony of the men who examined the boat at that time [when found] varied the depression from one inch to three inches."

Three of plaintiff's witnesses who examined the boat on the beach testified that they examined the patch both on the outside and *inside* of the hull. I believe it significant that the opening can be closed by exerting very little pressure.

Since man has ventured upon water he has been plagued with water in the bilge of his boat. Emergency treatment of the problem is not technical; the procedure is simple.

First, find how and from where the water is entering; second, try to stop it; third, remove the water already accumulated.

Mr. Millholland did not enter the cabin after water was discovered in the cockpit. His statement that "We could not tell where the water was coming from, but we knew it was coming," is accurate; he did not look.

Mr. Williams testified that " . . . the first thing I thought of was bailing." He and Mr. Adler entered the cabin to look for something with which to bail. Mr. Williams saw no water in the cabin. Mr. Millholland testified " . . . I more or less ordered them out of there."

Had any of the three men *looked*, the source of the water would have been discovered. A buoyant life cushion or a mattress (photograph shows two bunks aboard) (Exhibit

3) placed over the break and the application of slight pressure would have stopped water entering the hull.

The boat was under way when it listed, throwing Mr. Williams, Mr. Adler, and Mr. Millholland's son into the water. Mr. Millholland testified:

"Q. After they were thrown into the water, what happened? A. Then I dove in. The boat was at such an angle that maybe it would have gone over anyway, but anyway, in any case, when I saw my son go into the water I plunged in after him. Q. You went to your son's aid? A. I don't know about his aid, but I wanted to be with him. Evidently my leaving the boat, or all of us leaving the boat relieved the chopping condition."

As stated in the majority opinion,

"It [the boat] circled its former occupants twice and then went away from them. The engine ran for four or five minutes; the mast lights were visible for another four or five minutes; and then it was no longer visible."

Mr. Millholland also testified that the boat may have been 50 yards or 250 yards from them when the motor stopped; Mr. Williams said the boat was about a block away when he last saw it. They ". . . were about in the middle of the channel, . . ." which, at Point Robinson, is about 2 miles wide; yet they started to swim ". . . for what would ordinarily be the nearest shore."

Thus the sole means of survival under the control of the former occupants of the boat, which remained afloat, was abandoned.

Where, in the sequence of events between the original default and the final mischief, an entirely independent and unrelated cause intervenes, and is of itself sufficient to stand as the cause of the mischief, I believe it becomes the sole proximate cause. No amount of human foresight which could reasonably be exacted as a duty from defendant could anticipate the *abnormal, unusual,* and *highly extraordinary* conduct and events immediately preceding Mr. Adler's drowning.

For these reasons, I dissent.

DONWORTH, J. concurs with WEAVER, J.