**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| In re Custody of: ) | No. 80633-5-I |
| ) | |
| A.A., ) | |
| ) | |
| Child, ) | |
| ) | |
| NOLAN ANDERSON, III, ) | |
| ) | |
| Appellant, ) | |
| ) | DIVISION ONE |
| and ) | |
| ) | |
| SHERRI KIRSCHBAUM, ) | UNPUBLISHED OPINION |
| ) | |
| Respondent. ) | FILED: January 21, 2020 |
| ) | |

MANN, A.C.J. — Nolan Anderson appeals the trial court's decision approving a major change to the parenting plan between himself and Sherri Kirschbaum concerning their child A.A. Anderson challenges multiple findings of fact made by the trial court and its decision restricting Anderson's contact with A.A. to one 15-minute phone call per week. Anderson also challenges the trial court's findings of intransigence and its award of attorney fees to Kirschbaum. Because the trial court's findings are supported by substantial evidence and support its conclusions and decision, we affirm. We also award Kirschbaum her reasonable attorney fees and costs on appeal.

I.

Kirschbaum and Anderson, who are both members of the United States Army, had a casual dating relationship. When she became pregnant, Kirschbaum testified that Anderson asked her to get an abortion. Kirschbaum gave birth to A.A. in 2011. Two weeks later, Kirschbaum notified Anderson about the birth of A.A. Kirschbaum subsequently received a letter from Anderson's attorney telling her to have no further contact with Anderson.

Anderson was verified as A.A.'s father in a paternity action in late 2012. Although there was no parenting plan in place, Kirschbaum allowed Anderson to visit A.A. Anderson visited A.A. for the first time when the child was six months old. Kirschbaum and Anderson later obtained a mediated settlement agreement in Texas, where both parties lived. Anderson had visitation times with A.A., and the parties provided for various visitation schedules based upon the parties' proximity to each other.

In March 2013, Kirschbaum was transferred to Joint Base Lewis-McChord (JBLM). She and A.A. lived in Vancouver, Washington. Kirschbaum subsequently learned that Anderson was reporting her to child protective services (CPS). She obtained copies of the CPS reports after making public information requests. The first report, filed in December 2015, alleged that Kirschbaum fed A.A. peanut butter cups, although he is allergic to peanuts. The second report, which was filed shortly after, said that Kirschbaum had sexually assaulted A.A. and that she had flushed his head in the toilet. Through the CPS reports, Kirschbaum learned that A.A. had been seeing

counselors without her consent. Kirschbaum complied with CPS investigations, and CPS in both Washington and Texas determined the allegations to be unfounded.

Kirschbaum petitioned for modification of the parenting plan. Kirschbaum did not file a mediation request as provided in the Texas parenting plan. Kirschbaum testified that she filed the modification after becoming "very concerned," from reading the CPS reports about her. In her declaration, Kirschbaum stated that she was very concerned about Anderson's "mental health and emotional well-being" in regards to caring for A.A.

Anderson stipulated that there was adequate cause for modification but denied Kirschbaum's allegations. The court appointed a Guardian ad Litem (GAL) for A.A. The court entered a temporary parenting plan in January 2017 granting Kirschbaum all major decisionmaking power. Anderson's contact with A.A. was restricted to three phone calls per week.

Anderson moved for a new temporary parenting plan shortly before trial was scheduled to begin on November 30, 2017. Anderson argued that Kirschbaum's failure to notify him of a temporary relocation to Texas was in violation of the current temporary parenting plan. The court denied the motion for changes to the temporary parenting plan, citing the upcoming trial. Anderson later withdrew his stipulation to the finding of adequate cause for modification.

At a bench trial, numerous witnesses testified. The GAL, Richard Bartholomew, testified about A.A.'s relationship with Anderson:

> I think there is already emotional harm, given how, when I talked to [A.A.] about talking to his dad, [A.A.] basically shuts down. He gets really, really quiet and says, "I don't want to talk about that," even though he will talk about other things, and he will be quite lively about talking about other things, but when it comes to talking about just talking to his dad, he is really uncomfortable.

3

The GAL report states that Anderson often accused A.A. of lying. A.A. told the GAL that he did not like phone calls with his father, because "his father asks him questions and that bothers him. He is afraid that his father will get angry with him if he does not say the right thing."

In the report, the GAL explained that Anderson filed several unfounded CPS complaints against Kirschbaum. The report also states that Anderson sought counseling without Kirschbaum's consent. A.A. was seen by Dr. Ann-Louise Lockhart. Dr. Lockhart said that A.A. described the peanut incident and toilet incident during her two meetings with him.

The GAL contacted Kristine Marsh, from the Family Advocacy Program at JBLM. She was involved with the CPS reporting as both the parents are in the military. Marsh described how Anderson would influence A.A. during the investigation:

> when [A.A.] was interviewed in Texas, he first said nothing. He then went out to see his dad. Nolan then said he should talk to the interviewer again, and this time [A.A.] made allegations. Ms. Marsh said she reviewed the interviewer's notes and they were yes or no questions, which are not appropriate in a forensic setting. She told Nolan this and he became upset. Nolan gets upset when he is not getting what he wants.

The GAL tried to contact Catherine Parten, a play therapist in Texas, at the request of Anderson. Parten said that she needed a release to speak to him, and that she had spoken to Anderson about obtaining a release. Parten then ended contact with the GAL. Anderson did not remember if he was asked to give a release.

The GAL concluded that "there is abusive use of conflict" in the case, citing Anderson's filing of complaints without talking to Kirschbaum. He said that A.A. is uncomfortable on the phone with his father because Anderson alienates A.A. by getting

4

angry if he does not say bad things about his mother. The GAL concluded that Anderson's contact with A.A. should remain limited.

Kirschbaum testified that Anderson did not provide her with his home address until recently, after the modification proceedings had begun. Kirschbaum testified that although she had spoken to Parten, she did not know that Anderson had taken A.A. to more counselors until she obtained the CPS reports.

A.A's caregiver, Beth Harley, described an incident when A.A. was playing dress-up and was wearing a tutu. Anderson asked A.A. why he was "wearing girl's clothing" in a tone that upset A.A. Harley said that A.A. often "becomes frustrated" when he is on the phone with his father, "because he feels that his father isn't, you know, wanting to engage in this conversation with him."

Beth Smith, another caregiver of A.A., testified that A.A. would get "quite upset" when on the phone with his father. Once, A.A. was talking about how a toilet functioned, and Anderson told him "[A.A.], why are you talking about potties? That's not right. Normal people don't talk like that." Another incident occurred when A.A. called himself "cuckoo crazy," and laughed, but Anderson was "enraged" and said "[A.A.] don't tell me you're crazy ever again." Smith also observed phone conversations between A.A. and Anderson when Anderson was critical of A.A.'s eating habits.

The trial court approved Kirschbaum's request for a major change to the parenting plan, limiting Anderson's contact with A.A. Consistent with RCW 26.09.191, the trial court concluded that limitations on Anderson's contact with A.A. were appropriate because Anderson (1) has a long term emotional or physical problem that gets in the way of his ability to parent, (2) has few or no emotional ties with the child,

and (3) uses conflict as a way that endangers or damages the psychological development of the child.

The trial court's notable findings include:

10.11 The Court finds that the Father withheld his address information from the mother.

. . . .

10.15 The Court finds that the Guardian ad Litem Richard Bartholomew's testimony was credible.

10.16 The Court finds that the Father did not sign releases for at least one of the professionals that the child was taken to and because of that, the Guardian ad Litem was unable to speak directly to that provider. The Court finds that if the Guardian ad Litem would have been able to speak with the provider, that they more likely than not would not have supported the Father's testimony as to her counseling with the child and statements the child made to her.

10.17 The Court finds that the Respondent/Father took the child to counselors without any notice or agreement by the Mother/Petitioner. The Court finds that the child was essentially coached or encouraged into making false allegations of abuse in his mother's care to professionals the Father took the child to. The Court finds that the Father denied such at trial but the Court did not find that denial credible, given the other evidence.

10.18 The Court finds that the Respondent/Father made or created circumstances that caused others to make reports to CPS in Texas and in Washington and the Criminal Investigation Division, all of which were later determined to be unfounded.

10.19 The Court finds that credible testimony at trial was that the Father/Respondent inappropriately and without notice to the Mother/Petitioner, subjected the child to multiple evaluations, including at least one forensic evaluation as the Mother was alleged to have committed sexual abuse.

10.20 The Court finds that the Respondent/Father engaged in abusive use of conflict by interrogating the child during his phone and Facetime conversations. The Court finds that the Guardian ad Litem testified credibly about this issue and that the child's doctors and others identified that those ongoing interrogations by the Father were traumatizing and also constituted a form of alienation, alienating him from his Mother.

10.21 The Court also finds that there was evidence showing that the Father took pictures of the Mother during Facetime calls without permission or notice and that this is abusive use of conflict.

10.22 The Court finds that the Father enrolled [A.A] in school in Texas without the knowledge of the Mother when the Mother was the primary residential parent of the child, and the Father engaged in abusive use of conflict by his undermining of the Mother's relationship with the child. The court finds this included, specifically, name calling of the child's Mother, demeaning online postings of the Mother and her background. The Court finds that none of this was disputed by the Father during the trial.

10.23 The Court also finds that the Respondent/Father prolonged this case. The prolonging of this case, the Court finds, constitutes the abusive use of conflict. The Court finds that it appears to the Court that the Father used the Court process as a tool not to just hurt the Mother because what hurts her emotionally or financially can cause a negative effect on the child as well.

10.24 The Court also finds that there was emotional abuse of the child by the Father, in particular with the constant reminding by the Father to the child to tell the truth, constantly asking him questions about many, many things, such that the child feels afraid to answer for fear of letting his father down or telling him the wrong answer.

10.25 The Court finds that there is emotional abuse of the child in this case in taking the child to multiple examinations by multiple professionals, including military officers and CPS professionals.

10.26 The Court also finds that there is emotional abuse in this case based on the Guardian ad Litem's investigation of undermining the child's relationship with his mother who has been the primary caretaker for his entire life. The Court finds that the Guardian ad Litem testified credibly that emotional abuse already exists and harm from that behavior has already occurred to the child.

10.27 The Court finds that there should be restrictions on the Father/Respondent based on the Father's abusive use of conflict.

10.28 The Court also finds absence of emotional ties between the Father and child.

10.29 The Court also finds that evidence supports that there is a long-term impairment that interferes with Father/Respondent's parenting functions of [A.A.]. The Court finds that there is evidence and credible testimony that

there is an impairment of the relationship between the Respondent/Father and child.

10.30 The Court finds that there is a long history of inappropriate behaviors by the Father, such as taking the child to providers when the Father knows it is not healthy emotionally for the child and withholding information from the Mother.

10.31 The Court finds that the Mother's proposed parenting plan should be adopted with a few changes.

10.32 The Court finds that as was identified in the temporary order and requested by the Guardian ad Litem, that it is appropriate for Mr. Anderson to demonstrate changed behaviors before the Court would consider making changes to the parenting plan.

10.34 The Court finds that an award of attorney fees based on intransigence is appropriate.

10.35 The Court finds that there was intransigence as Mr. Anderson's refusal to comply with Court orders, resulting in the Mother having to spend additional attorney fees as well as late filings which resulted in additional work by counsel. The Court finds that there was also repeated changing of positions by the Respondent as well as a last-minute request at trial to withdraw stipulation of adequate cause.

10.36 The Court finds that the Respondent taking the child to counselors and others without notice to Mother, after being specifically advised not to, resulted in additional work for the Petitioner and counsel, trying to research exactly what occurred.

10.37 The Court finds that the Father's behavior throughout the course of the case, almost two years of litigation, made the proceedings unduly costly and difficult for the Mother.

In the final parenting plan, the court limited Anderson's contact with A.A. to one 15-minute phone call per week. The court found that Anderson's visitation with A.A. should remain restricted until Anderson attends parenting classes and counseling. The court awarded Kirschbaum $25,000 in attorney fees based on Anderson's intransigence and the need and ability to pay. Anderson appeals.

II.

Anderson first contends that the trial court erred in restricting his contact with A.A to one 15-minute phone call per week. This is so, Anderson argues, because the trial court's findings in support of its RCW 26.09.191(3) limitations are not supported by substantial evidence. We disagree.

A.

The right to parental autonomy constitutes a protected, fundamental liberty interest under the Fourteenth Amendment to the United States Constitution. In re Marriage of Chandola, 180 Wn.2d 632, 646, 327 P.3d 644 (2014). We review parenting plans for an abuse of discretion. Chandola, 180 Wn.2d at 642. A trial court abuses its discretion when the parenting plan is "manifestly unreasonable or based on untenable grounds or untenable reasons." Chandola, 180 Wn.2d at 642. "The trial court's findings of fact are treated as verities on appeal, so long as they are supported by substantial evidence." Chandola, 180 Wn.2d at 642. Evidence is substantial when it is sufficient to persuade a fair-minded person of the truth of the matter asserted. Chandola, 180 Wn.2d at 642.

As the trial court has the opportunity to observe the parties, the appellate court should be "extremely reluctant to disturb child placement dispositions." In re Parentage of Schroeder, 106 Wn. App. 343, 349, 22 P.3d 1280 (2001).

Although parenting plans are reviewed for abuse of discretion, the trial court is bound by chapter 26.09 RCW. Chandola, 180 Wn.2d at 642. The procedure relating to modification of a parenting plan is statutorily prescribed, and compliance with the statutory procedures is mandatory. Bower v. Reich, 89 Wn. App. 9, 14, 964 P.2d 359

(1997). A trial court modifies a parenting plan when a "substantial change has occurred in the circumstances of the child or the nonmoving party and that the modification is in the best interest of the child and is necessary to serve the best interests of the child." RCW 26.09.260. The court may preclude or limit provisions of the parenting plan if a parent's involvement of conduct may have an adverse effect on the child's best interests. RCW 26.09.191(3). Specifically, the court may limit the parent's involvement if the parent has "a long-term emotional or physical impairment which interferes with the parent's performance of parenting functions," where there is "[t]he absence of substantial impairment of emotional ties between the parent and the child," or where "[t]he abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development." RCW 26.09.191(3)(b), (d), (e).

### B.

Anderson argues that the trial court's limitations based on RCW 26.09.191(3) are unsupported by the facts. Anderson assigns error to the trial court's findings of fact, arguing that they are not supported by substantial evidence. We address each in turn.

Findings 10.11 and 10.16

The trial court found that Anderson withheld his address from Kirschbaum (Finding 10.11), and then failed to sign a release to allow the GAL to interview Parten, the play therapist retained by Anderson (Finding 10.16). These findings assisted the trial court's conclusion that Anderson was intransigent supporting its award of attorney fees to Kirschbaum.

The Texas parenting plan required Anderson to provide his address. Kirschbaum testified that despite asking for it repeatedly so that she knew where A.A.

10

was residing, Anderson did not provide his address until after the modification proceedings in Washington were initiated.

The GAL report states, that at Anderson's request, the GAL attempted to speak with Parten, but Parten would not speak with him unless Anderson signed a release. The GAL report also states that Parten had spoken with Anderson about a release and would get back to the GAL "in a couple of days," but never did.

There is substantial evidence to support the trial court's finding that Anderson failed to provide his address to Kirschbaum and that he failed to provide a release for Parten to speak with the GAL.

Finding 10.16

The trial court inferred that if the GAL had been allowed to speak with Parten, "more likely than not" that Parten's statements would not support Anderson's testimony as to her counseling with A.A. (Finding 10.16). Anderson asserts this finding is based on speculation.

The trial court is permitted to draw reasonable inferences from the evidence. Adler v. Univ. Boat Mart, Inc., 63 Wn.2d 334, 338, 387 P.3d 509 (1963). Further, Anderson failed to offer evidence demonstrating that Parten's testimony would have supported his argument. The trial court acted within its discretion in making finding 10.16.

Finding 10.17

Under the Texas parenting plan, the parties were to have joint decisionmaking regarding non-emergency medical treatment. The trial court found that Anderson took A.A. to counselors, without notice to, or agreement by, Kirschbaum. (Finding 10.17).

11

Kirschbaum confirmed that she did speak to Parten, after Parten contacted her on the day of treatment, asking for permission to treat A.A. Kirschbaum, however, testified that she did not learn that A.A. had seen other counselors until she read the CPS reports. Kirschbaum testified that she was not contacted by Anderson concerning A.A. seeing other counselors. Anderson cites only his notification of Parten and appears to concede that he did not have Kirschbaum's agreement regarding other medical providers. Substantial evidence supports the trial court's finding.

Finding 10.17 (2)

The trial court found that Anderson "essentially coached or encouraged" A.A. to make false allegations of abuse to professionals. (Finding 10.17). Anderson argues that the word "coaching" was never used in the record.

Although the word "coach" was not specifically used, Marsh, of the Family Advocacy Program at JBLM, described highly suggestive behaviors that Anderson used on A.A. during interviews. Further, the GAL reported that Anderson would get upset when A.A. would not say bad things about his mother, which is a form of parental alienation. The GAL also reported that A.A. reported his father getting angry with him if A.A. does not say the "right" thing. These accounts of Anderson using suggestive behavior on A.A. provide substantial evidence to support the trial court's finding.

Finding 10.18

The trial court found that Anderson made, or created circumstances that caused others to make, reports to the Texas and Washington CPS and Washington criminal investigation division—all of which were determined to be unfounded. (Finding 10.18). While Anderson concedes the GAL presented evidence supporting this finding in the

12

GAL report, he argues that the GAL report does not demonstrate that Anderson created the circumstances to cause the reports, or the evidence is hearsay and requires speculation.

Anderson did not, however, object to the trial court's admission of either the GAL report or the GAL's testimony. Because the trial court's finding is supported by the GAL report and testimony, the finding is supported by substantial evidence.

### Findings 10.20 and 10.24

The trial court found that Anderson engaged in abusive use of conflict by interrogating A.A. during phone calls, and causing A.A. to fear saying the wrong things or letting his father down by offering inadequate answers. (Findings 10.20 and 10.24). Anderson argues that there is a lack of substantial evidence to support these findings. Anderson relies on the testimony of three caregivers, Monique Ferrer, Beth Harley, and Beth Brown, and contends that they did not mention "interrogating."

Here, the GAL explained that A.A. did not like talking on the phone with his father, because Anderson would accuse A.A. of lying over trivial matters and A.A. was concerned about not saying the "right" thing. A.A.'s caregivers observed several instances of Anderson getting very upset with A.A. for typical child behavior. These third party accounts provide sufficient evidence to support the trial court's finding.

Several witnesses, including Kirschbaum and the GAL testified to Anderson's interrogating behavior. In addition, while perhaps not using the term interrogating, both Harley and Smith testified to observations where Anderson asked A.A. questions in what "wasn't a very nice tone," or telling A.A. that "normal people don't talk like that."

Substantial evidence supports the trial court's findings that Anderson's interrogating behavior constituted emotional abuse and abusive use of conflict.

Findings 10.24, 10.25, 10.26

The trial court found that Anderson had emotionally abused A.A. by his constant questioning, taking the child to multiple examinations by multiple professionals, and by undermining his relationship with his mother—his primary caregiver all of his life. (Findings 10.24, 10.25, 10.26). Anderson again argues that these findings are not supported by substantial evidence.

Much of the evidence supporting the court's findings overlaps with the evidence supporting the trial court's findings that Anderson interrogated A.A. and engaged in the abusive use of conflict. The GAL report states that A.A. is afraid that Anderson will be angry with him if he says the wrong thing. Dr. David Callies reported that A.A. becomes nervous, anxious, and upset about the prospect of speaking with his father on the phone.

Substantial evidence supports the trial court's findings that Anderson made A.A. afraid and emotionally abused him.

Emotional or Physical Problem

Anderson challenges the trial court's conclusion in the final parenting plan that Anderson has a long-term emotional or physical problem that gets in the way of his ability to parent A.A. Anderson argues that there was no evidence to show that Anderson had a physical limitation, citing his medical records.

The trial court's conclusion was based on RCW 26.09.191(3)(b). RCW 26.09.191(3) allows the court to limit a parent's involvement if the parent has an

emotional or physical problem. The trial court found that Anderson had emotional limitations, relying on the GAL's report about Anderson's abusive use of conflict and parental alienation. The GAL explained in detail how Anderson made unsubstantial reports to CPS and how Anderson tried to make A.A. say bad things about his mother. The GAL also witnessed A.A. shutting down when asked about his father, and explained that Anderson's interactions with A.A. constituted emotional harm to the child. Additionally, A.A.'s caregivers witnessed Anderson's emotionally harmful behavior toward A.A. over the phone. There is substantial evidence to support the trial court's finding that Anderson had emotional limitations that interfered with his ability to parent.[1]

Anderson ultimately argues that the trial court erred by adopting Kirschbaum's proposed parenting plan due to the challenged findings. Because we hold that substantial evidence supports the trial court's findings of fact, the court did not err in adopting a parenting plan that was similar to Kirschbaum's proposed parenting plan.

We affirm the parenting plan.

III.

Anderson next argues that the court erred in granting Kirschbaum an award of attorney fees based on intransigence instead of applying a need and ability to pay analysis. We disagree.

"Awards of attorney fees based upon the intransigence of one party have been granted when the party engaged in foot-dragging and obstruction or simply when one party made the trial unduly difficult and increased legal costs by his or her actions." In

---

[1] Anderson does not challenge the trial court's conclusion under RCW 26.09.191(3)(d) that Anderson has few or no emotional ties with A.A.—an independent finding supporting the trial court's limited contact order.

re Marriage of Katare, 175 Wn.2d 23, 42, 283 P.3d 546 (2012). When intransigence is established, financial resources are irrelevant. In re Marriage of Greenlee, 65 Wn. App. 703, 708, 829 P.2d 1120 (1992). "Unchallenged findings of fact are verities on appeal." In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015).

Here, the trial court found that an award of attorney fees based on intransigence was appropriate. In awarding fees, the court found that Anderson refused to comply with court orders, filed briefs late, and withdrew his stipulation of adequate cause at the last minute. The court determined that this behavior made the process of litigation unduly costly and difficult for Kirschbaum. Because Anderson does not specifically challenge these findings, we treat them as verities as appeal. Further, there is overwhelming and substantial evidence in the record to support the court's finding of intransigence.

We affirm.

## IV.

Kirschbaum asks for fees on appeal based on Anderson's intransigence, the parties' relative need and ability to pay, and under RAP 18.9 for bringing a frivolous appeal.

RCW 26.09.140 provides that this court may, in its discretion, order a party to pay reasonable attorney fees and costs to the other party for maintaining the appeal. Here, the trial court concluded that the parties' relative need and ability to pay warranted an award of reasonable attorney fees to Kirschbaum. It does not appear from Kirschbaum's financial declaration that her financial circumstances have changed since

the date of the trial court's award.  We award reasonable attorney fees and costs on appeal to Kirschbaum subject to her compliance with 18.1(d).

Affirmed.

_____
Mann, A.C.J.

WE CONCUR:

_____                    _____
Leach, J.                                                                    Appelwick, C.J.